1  WO

2

3

4

5

6             IN THE UNITED STATES DISTRICT COURT

7              FOR THE DISTRICT OF ARIZONA

8

9   Larry Meador, *et al.*,                          No. CV-19-08345-PCT-JJT

10                 Plaintiffs,              **ORDER**

11  v.

12  Aramark Sports and Entertainment Services
    LLC,

13

14                 Defendant.

15          At issue is Plaintiffs Larry Meador and Annette Meador's Motion to Strike Expert

16  Reports, Testimony and Video Reenactments Disclosed by Aramark (Doc. 72, Pls.' Mot.

17  to Strike), to which Defendant Aramark Sports and Entertainment Services LLC

18  ("Aramark") filed a Response (Doc. 79, Def.'s Resp.), and Plaintiffs filed a Reply

19  (Doc. 85). Also at issue are Aramark's Motion to Exclude Expert Testimony of John Sutton

20  Under the Daubert Standard (Doc. 73, Def.'s Mot. to Exclude I) and Motion and Points

21  and Authorities to Exclude Expert Testimony of Joe Derie Under the Daubert Standard

22  (Doc. 74, Def.'s Mot. to Exclude II) and Plaintiffs' Responses (Doc. 80, Pls.' Resp. I)

23  (Doc. 81, Pls.' Resp. II). Lastly, at issue is Aramark's Motion for Summary Judgment

24  (Doc. 75, MSJ), to which Plaintiffs filed a Response (Doc. 83, Pls.' Resp. to MSJ) and

25  Aramark filed a Reply (Doc. 88).

26  **I.      BACKGROUND**

27          This case involves injuries suffered by Plaintiffs Larry Meador and Annette Meador

28  ("the Meadors") while boating on Lake Powell on the Navajo Canyon. Because Plaintiffs

1  are the non-moving party, the Court will credit their evidence underlying any disputed

2  facts.

3        On September 27, 2019, Larry Meador was operating his 29-inch Hallett 290

4  powerboat on Lake Powell in Navajo Canyon. Annette Meador was also on board along

5  with Emily and Maeson Lewis. Five other members of the Lewis family were on jet skis

6  behind the boat. Plaintiffs contend that as they approached a right-hand turn, the M/V

7  Desert Shadow (the "Desert Shadow"), owned by Aramark, came around the turn at a high

8  rate of speed and passed closely by the left side of the Meadors' boat. (Plaintiffs' Statement

9  of Facts ("PSOF") ¶¶ 3-4.) Because the Meadors' boat was to the far right of the channel,

10 the Desert Shadow had ample room to move to its right side, but instead it drove down the

11 center of the channel. (PSOF ¶¶ 13, 18, 26.) The Desert Shadow produced a wake that

12 caused the front end of the Meadors' boat to elevate and then crash back down onto the

13 water. Upon impact, Ms. Meador suffered a thoracic fracture at T-12 and was taken by air

14 ambulance to a hospital in St. George, Utah. (PSOF ¶¶ 16-17.)

15      Aramark contends that the Desert Shadow could not have produced a wake larger

16 than three feet and that Mr. Meador's negligent operation of his boat caused the accident.

17 (Defendant's Statement of Facts ("DSOF") ¶¶ 4, 8.) Plaintiffs counter that the wake was

18 larger than three feet, Captain Phil Anderson's operation of the Desert Shadow was

19 unreasonable, and that Mr. Meador properly operated his boat.

20      Plaintiffs brought claims for negligence and punitive damages against Aramark.

21 They argue that Aramark was aware that the wakes produced by its boats caused accidents

22 and put other boaters' safety at risk. Each side has produced multiple expert reports in this

23 litigation and has filed multiple motions to strike. While each report contains information

24 that will not be admissible at trial, none of the expert reports will be stricken in their

25 entirety. Furthermore, because there are material issues of fact as to multiple elements of

26 Plaintiffs' negligence and punitive damages claims, Aramark's Motion for Summary

27 Judgment will be denied in its entirety.

28

1    **II.    LEGAL STANDARD**

2    **A.    Motions to Strike and Exclude**

3    Rule 702 of the Federal Rules of Evidence tasks the trial court with ensuring that

4    any expert testimony provided is relevant and reliable. *Daubert v. Merrell Dow Pharm.,*

5    *Inc.* (*Daubert*), 509 U.S. 579, 589 (1999). "Evidence is relevant if it has any tendency to

6    make a fact more or less probable than it would be without the evidence and the fact is of

7    consequence in determining the action." Fed. R. Evid. 401. The trial court must first assess

8    whether the testimony is valid and whether the reasoning or methodology can properly be

9    applied to the facts at issue. *Daubert*, 509 U.S. at 592-93. Factors to consider in this

10   assessment include: whether the methodology can be tested; whether the methodology has

11   been subjected to peer review; whether the methodology has a known or potential rate of

12   error; and whether the methodology has been generally accepted within the relevant

13   professional community. *Id.* at 593-94. "The inquiry envisioned by Rule 702" is "a flexible

14   one." *Id.* at 594. "The focus . . . must be solely on principles and methodology, not on the

15   conclusions that they generate." *Id.*

16   The *Daubert* analysis is applicable to testimony concerning non-scientific areas of

17   specialized knowledge. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).

18   However, the *Daubert* factors may not apply to testimony that depends on knowledge and

19   experience of the expert, rather than a particular methodology. *U.S. v. Hankey*, 203 F.3d

20   1160, 1169 (9th Cir. 2000) (citation omitted) (finding that *Daubert* factors do not apply to

21   police officer's testimony based on 21 years of experience working undercover with

22   gangs). An expert qualified by experience may testify in the form of opinion if his or her

23   experiential knowledge will help the trier of fact to understand evidence or determine a fact

24   in issue, as long as the testimony is based on sufficient data, is the product of reliable

25   principles, and the expert has reliably applied the principles to the facts of the case. *See* Fed.

26   R. Evid. 702; *Daubert*, 509 U.S. at 579.

27   The advisory committee notes on the 2000 amendments to Rule 702 explain that

28   Rule 702 (as amended in response to *Daubert*) "is not intended to provide an excuse for an

1   automatic challenge to the testimony of every expert." *See Kumho Tire Co.*, 526 U.S. at

2   152. "Vigorous cross-examination, presentation of contrary evidence, and careful

3   instruction on the burden of proof are the traditional and appropriate means of attacking

4   shaky but admissible evidence." *Daubert*, 509 U.S. at 595 (citation omitted).

5           **B.      Motion for Summary Judgment**

6           Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is

7   appropriate when: (1) the movant shows that there is no genuine dispute as to any material

8   fact; and (2) after viewing the evidence most favorably to the non-moving party, the

9   movant is entitled to prevail as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*,

10  477 U.S. 317, 322-23 (1986); *Eisenberg v. Ins. Co. of N. Am.*, 815 F.2d 1285, 1288-89 (9th

11  Cir. 1987). Under this standard, "[o]nly disputes over facts that might affect the outcome

12  of the suit under governing [substantive] law will properly preclude the entry of summary

13  judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue"

14  of material fact arises only "if the evidence is such that a reasonable jury could return a

15  verdict for the nonmoving party." *Id.*

16          In considering a motion for summary judgment, the court must regard as true the

17  non-moving party's evidence, if it is supported by affidavits or other evidentiary material.

18  *Celotex*, 477 U.S. at 324; *Eisenberg*, 815 F.2d at 1289. However, the non-moving party

19  may not merely rest on its pleadings; it must produce some significant probative evidence

20  tending to contradict the moving party's allegations, thereby creating a material question

21  of fact. *Anderson*, 477 U.S. at 256-57 (holding that the plaintiff must present affirmative

22  evidence in order to defeat a properly supported motion for summary judgment); *First Nat'l*

23  *Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968).

24          "A summary judgment motion cannot be defeated by relying solely on conclusory

25  allegations unsupported by factual data." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir.

26  1989). "Summary judgment must be entered 'against a party who fails to make a showing

27  sufficient to establish the existence of an element essential to that party's case, and on

28

1    which that party will bear the burden of proof at trial.'" *United States v. Carter*, 906 F.2d

2    1375, 1376 (9th Cir. 1990) (quoting *Celotex*, 477 U.S. at 322).

3    **III.    ANALYSIS**

4          **A.     John R. Curry's Expert Report and Videos**

5          Mr. Curry conducted and videotaped multiple sets of reenactments of the accident

6    for Aramark using the Desert Shadow and a speedboat with the same dimensions as the

7    Hallett 290. He utilized Mr. Meador's as well as Ms. Lewis's testimony to determine the

8    positioning, speed, and passing distance of the boats. In one reenactment, the person

9    replicating Mr. Meador drove the boat differently in order to understand how Mr. Meador's

10   driving potentially led to the accident. (Doc. 72-2 at 7-8.)

11         Mr. Curry's report details the height of the wake produced by the Desert Shadow

12   during each reenactment as well as his methodology and any variables that potentially

13   affected the results. (Doc. 72-2 at 3-7.) Mr. Curry concluded: 1) the Desert Shadow

14   produced a wake of "2.5'-1.0' high (crest to trough)," which was a substantially smaller

15   wake than that described by Mr. Meador and Ms. Lewis; and 2) wakes of this height can

16   be safely navigated when the boat is properly operated. (Doc. 72-2 at 14.)

17         Plaintiffs argue that Mr. Curry's video reenactments and expert report should be

18   stricken in their entirety. They contend that the video reenactments are dissimilar to the

19   accident for the following reasons: 1) the Desert Shadow was empty in the reenactment

20   and thus did not account for the weight of the 81 passengers on board at the time of the

21   accident; 2) the reenactment did not use the same crew as was on board the day of the

22   accident; and 3) Mr. Curry did not allow Plaintiffs' experts to participate in the

23   reenactment. (Pls.' Mot. to Strike at 3.)

24         The Court finds that these issues do not warrant the exclusion of the videos or

25   Mr. Curry's expert report. The report and reenactment are relevant and based on the

26   testimony of Plaintiffs' witnesses. Plaintiffs fail to explain how using a different crew for

27   the reenactment would negatively affect its accuracy and do not cite any case law for the

28   proposition that experimental evidence should be excluded where one side did not seek the

1   input of the opposing party. The omission of the passengers' weight is Plaintiffs' strongest

2   argument for barring the evidence. However, Mr. Curry calculated and explained in the

3   report how the additional weight from passengers would have affected the size of the wake.

4   (Doc. 72-2 at 9-10.) Plaintiffs contend that Mr. Curry wrongly used 120 pounds as the

5   average weight per passenger because United States Coast Guard ("USCG") guidelines

6   state that 185 pounds is the average weight per passenger. This as well as the other issues

7   Plaintiffs identify are areas for cross examination, not reasons to exclude the reenactment

8   and report altogether. *See Daubert*, 509 U.S. at 595. The Court thus finds that Mr. Curry's

9   reenactment videos and subsequent expert report meet Rule 702's standard and will be

10  admissible at trial.

11  **B.    William Dials's Expert Report**

12  Mr. Dials's expert report concluded that Mr. Meador did not properly operate his

13  boat and discussed the veracity of Plaintiffs' experts. He utilized deposition testimony as

14  well the U.S. Coast Guard Rules of the Road ("COLREGS"). Plaintiffs argue that

15  Mr. Dials's expert report should be stricken because it relied on Mr. Curry's flawed video

16  reenactments of the accident to conclude that the Desert Shadow's wake was two and a

17  half feet. Aramark counters that Mr. Dials's expert report neither relies on nor discusses

18  the videos and appears to assert in a footnote that Mr. Dials relied on Mr. Celano's expert

19  report, which Plaintiffs did not challenge. (Def.'s Resp. at 2 n. 1.) However, Mr. Dials did

20  not list Mr. Celano's expert report as a document he relied upon in his report. (Doc. 72-1

21  at 2.) If Mr. Dials ultimately testifies at trial, he must explain how he determined that the

22  wake size was two and a half feet.

23  Plaintiffs subsequently contend for the first time in their Reply that Mr. Dials

24  offered inappropriate conclusions on multiple topics. Although these issues should have

25  been raised in Plaintiffs' initial Motion to Strike, the Court agrees with Plaintiffs that

26  portions of Mr. Dials's report must be stricken. Mr. Dials may freely opine that Mr. Meador

27  erred by not having a lookout, or that he approached the wake improperly; however, he

28  must not volunteer an opinion on Mr. Meador's negligence or level of fault. Where

1      Mr. Dials opines that "Larry Meador is wholly at fault for this incident," (Doc. 72-1

2      at 7), the opinion is an improper legal conclusion, which must be excluded. Furthermore

3      Mr. Dials will not be permitted to testify regarding his inappropriate conclusions on the

4      severity of Ms. Lewis's head injury, Captain Derie's alleged violations of navigation rules,

5      the witnesses' biases, and other improper, unsupported conclusions. (Doc. 72-1 at 3-4.)

6              **C.      John Sutton's Expert Report**

7              Mr. Sutton will testify regarding Aramark's allegedly deficient risk management

8      system and whether it sufficiently addressed the known problem that its boats produced

9      potentially dangerous wakes.

10             Aramark argues that Mr. Sutton's expert report should be stricken in its entirety

11     because it does not address the threshold questions of whether the Desert Shadow could

12     generate wakes that would be dangerous to recreational boaters and his methodology was

13     flawed. (Def.'s Mot. to Exclude I at 5-6.) Aramark appears to suggest that Mr. Sutton's

14     expert report is irrelevant unless it addresses the size of the wake. The Court disagrees. As

15     Aramark acknowledges, multiple witnesses have testified that the Desert Shadow's wake

16     was between 8 and 18 feet high. (Def.'s Mot. to Exclude I at 5.) While an expert report

17     might be helpful to determine the wake size, one is not necessary where there are

18     eyewitnesses. A jury ultimately will evaluate the witnesses' credibility versus that of

19     Aramark's experts.

20             Furthermore, as discussed, *infra*, the size of the wake is not a threshold issue. Mr.

21     Sutton's expert testimony could assist the finder of fact with multiple other relevant aspects

22     of Plaintiffs' negligence and punitive damages claims. Mr. Sutton is qualified to testify to

23     risk management issues. His resume indicates that he is currently a self-employed Trip

24     Pilot, where he ensures that companies comply with applicable laws, regulations, as well

25     as their onboard policies, procedures, and Safety Management System ("SMS"). (Doc.

26     73-1 at 2.) He previously held similar responsibilities with the American Queen Steamboat

27     Company. (Doc. 73-1 at 2.)

28

1   The Court also will allow Mr. Sutton to testify regarding: 1) Aramark's Rules of the

2   Road Violations; 2) state boating laws regarding "no wake zones;" 3) Mr. Meador's

3   operation of the boat; 4) the use of a Safety Management System (SMS); 5) Passenger

4   Vehicle Association ("PVA") & Flagship SMS; and 6) Marine casualty reporting. Aramark

5   argues that Mr. Sutton is not qualified to offer opinions on the PVA because he is not a

6   member. The Court disagrees. Mr. Sutton's extensive resume provides the Court sufficient

7   assurance that he is qualified to testify as to Aramark's use of the PVA SMS and whether

8   compliance with the SMS would have decreased the likelihood of the accident.

9   However, Mr. Sutton will not be permitted to testify regarding issues on which he

10   is either unqualified or that are inappropriate for expert testimony. Mr. Sutton is thus not

11   permitted to offer legal conclusions. His statement that "Aramark has made a [conscious]

12   choice to ignore its grossly negligent operations in the numerous wake collision related

13   incidents" is inappropriate (Doc. 73-2 at 13.) He also may not testify to conclusions that

14   appear to be pure conjecture, such as "Aramark continues its dangerous operation on Lake

15   Powell for business reasons based solely on profit." (Doc. 73-2 at 13.)

16   Finally, the Court declines to reach a decision on whether Mr. Sutton may testify

17   to the alleged 28 previous incidents where the wake from an Aramark boat caused injuries

18   or the Carey and Gilmore litigations. Aramark argues that this evidence should be excluded

19   because it is prejudicial, will likely confuse the jury, and in many if not all of the incidents

20   or litigations, Aramark was not at fault. (Def.'s Mot. to Exclude I at 6-8.) The Court agrees

21   that there is danger in admitting this evidence. However, it is also relevant to Mr. Sutton's

22   assessment that Aramark did not have proper risk management protocols in place despite

23   being aware of the dangers posed by the boats' wakes. (Doc. 73-2 at 10-11, 14-15.) This

24   evidence is also relevant to Plaintiffs' negligence claim and punitive damages claim, as it

25   illustrates that Aramark was on notice of the potential safety hazard.

26   Therefore, Aramark shall file a motion in limine addressing whether Mr. Sutton may

27   testify regarding Aramark's knowledge of these incidents as well as the prior litigations

28

- 8 -

1   under Rules 403 and 702. [1] These motions may also address whether this evidence should

2   be admissible, separate from Mr. Sutton, at trial under Rule 403. Whereas Aramark's

3   current Motion to Exclude discusses the admissibility of the incidents as a whole,

4   Aramark's motion in limine should specify what makes each individual incident and

5   litigation inadmissible. (Mot. to Exclude I at 7.) Lastly, Plaintiffs' knowledge of many of

6   these incidents stems from internal Aramark emails produced in discovery. However,

7   others, such as the June 11, 2019 incident involving Joleen Cole, are not sourced.

8   (Doc. 73-2 at 9.) Plaintiffs must provide sources for all of the incidents or they will be

9   inadmissible.

10          **D.    Joe Derie's Expert Report**

11          Aramark contends that Mr. Derie's expert report should be stricken for the same

12   reasons. While the Court agrees that portions of the report are inadmissible, there are others

13   that are relevant and admissible. Mr. Derie will be permitted to testify regarding Sections

14   1 through 7 of his report, which discuss both Captain Anderson's and Mr. Meador's

15   operation of their respective vessels leading up to and during the accident. (Doc. 74-2

16   at 1-3.) Aramark argues that Mr. Derie's report simply relies on deposition testimony from

17   Plaintiffs' witnesses and does not contain independent analysis or scientific methodology

18   to determine the cause of the accident. Even if true, this is not disqualifying. Mr. Derie is

19   not a scientific expert; rather, his testimony is based on knowledge and experience. *See*

20   *Hankey*, 203 F.3d at 1169. Furthermore, while Mr. Derie's reliance on testimony from

21   Plaintiffs' witnesses may indicate bias, striking the entire report is unnecessary. Cross

22   examination is the preferred tool to test the bases for Mr. Derie's opinions as well as his

23   credibility. *See Daubert*, 509 U.S. at 595.

24          However, there are portions of Mr. Derie's report that are inadmissible. Mr. Derie

25   may not offer legal conclusions at trial. Section 10.1, stating that the Desert Shadow failed

26   _____

27   [1] Mr. Sutton will be permitted to testify regarding Aramark's risk management practices regardless of the Court's decision on the motion in limine. There are multiple admissible internal Aramark emails that discuss the risks posed by its boats' wakes, unrelated to any

28   specific incident. (PSOF ¶ 30, Ex. I at 24; ¶ 88, Ex. M at 57:14-58:1; ¶ 89, Ex. M at 60:7-61:3; Doc. 73-2 at 8, 14-15.)

1    "to use reasonable care under the circumstances at the time of the accident to avoid injuries

2    from the vessel's wake (negligence)," is wholly inappropriate and inadmissible. (Doc. 74-2

3    at 5.) Section 10.3 references the negligence discussed in 10.1 and is thus inadmissible as

4    well. (Doc. 74-2 at 5.) While Mr. Derie may opine that the Desert Shadow's failure to abide

5    by certain regulations and laws was a "substantial factor" causing injuries to Ms. Meador,

6    he may not refer to its actions as negligence.

7         Furthermore, Mr. Derie may not rely upon the alleged 28 previous incidents or the

8    Carey and Gilmore litigations. (Doc. 74-2 at 4.) He also may not testify to his personal

9    experience with the wake generated from an Aramark boat. (Doc. 74-2 at 4.) Unlike

10   Mr. Sutton, who references the previous 28 incidents as well as the litigations in his report

11   to illustrate Aramark's alleged risk management failings, Mr. Derie appears to only

12   reference the past incidents and litigations as evidence that Aramark acted negligently in

13   this instance. This evidence is overwhelmingly likely to lead to the Court's aforementioned

14   concerns about confusing the jury with irrelevant and prejudicial evidence and is thus

15   inadmissible under Rules 403, 702, as well as 404(b).

16        **E.    Motion for Summary Judgment on Negligence**

17        Aramark contends that summary judgment is warranted because the undisputed

18   facts show that the operation of the Desert Shadow was reasonable. Aramark cites

19   Mr. Celano's and Mr. Curry's expert reports that conclude that the Desert Shadow could

20   at most produce a 3-foot wake and the fact that Plaintiffs' experts did not rebut these

21   findings. (MSJ at 3.) However, Ms. Lewis testified that the wake was approximately 15

22   feet and Ms. Meador described the wake as "a huge wall."[2] (PSOF ¶ 7, Ex. C at 43:2-16;

23   PSOF ¶ 11, Ex. A at 145:25-146:16.) Aramark contends that this testimony is insufficient

24   to create a material factual dispute because the witnesses are "untrained, biased laymen."

25   (MSJ at 10.) The Court disagrees. As discussed, *supra*, expert testimony on the wake's size

26

27   [2] Plaintiffs do not cite to Mr. Meador's testimony regarding the height of the wake even though Aramark cites to it in its Motion for Summary Judgment. (MSJ at 3.) It is unclear if this omission was intentional. Regardless, there is sufficient controverting evidence as

28   to the wake's height as well as Aramark's reasonable operation of the Desert Shadow to preclude summary judgment.

1    is appropriate but not necessary. Ms. Lewis and Ms. Meador witnessed the Desert

2    Shadow's wake. There is no requirement that they be experts to testify as to what they saw.

3    Aramark may of course cross examine them on their potential biases and credibility issues.

4    But at the summary judgment stage, where the witnesses have testified under oath and

5    appear to otherwise be credible, the Court will credit their testimony.

6         Even if it was undisputed that the Desert Shadow created a wake that was three feet

7    or less, summary judgment still would be unwarranted. Aramark does not provide case law

8    or any other support for its contention that a wake of three feet or less will always preclude

9    a negligence claim. And Plaintiffs proffered additional evidence, through both lay and

10   expert witnesses, that Aramark did not operate the Desert Shadow reasonably.[3] Multiple

11   witnesses testified that the Desert Shadow turned at a high rate of speed and was operating

12   on the wrong side of the channel. Mr. O'Brien was aboard the Desert Shadow and testified

13   that the it was "smack dab in the middle of the channel," approximately 40 feet from the

14   wall on the left side and 20 feet from the Meadors' boat. (PSOF ¶¶ 25-26, Ex. H at 17:9-14.)

15   Plaintiffs also produced evidence that their boat was properly along the right side of the

16   canyon. (PSOF ¶ 18, Ex. D at 24:11-21). Both of Plaintiffs' experts will testify that

17   Aramark violated various boating laws and regulations in its operation of the Desert

18   Shadow on the day of the accident. Mr. Sutton also will testify that Aramark was aware

19   that its boats' wakes could lead to accidents but declined to adopt proper risk management

20   protocols. This evidence creates genuine disputes as to the material facts underlying

21   Plaintiffs' negligence claim. Therefore, the Court will deny Aramark's Motion for

22   Summary Judgment.

23        **F.    Motion for Summary Judgment on Punitive Damages**

24        The Court also will deny Aramark's Motion for Summary Judgment on punitive

25   damages. Summary judgment on the question of punitive damages is inappropriate if "a

26   reasonable jury could find the requisite evil mind by clear and convincing

27   _____

28   [3] Notably, Aramark expressly states that the outcome of its Motion for Summary Judgment is dependent on this Court excluding Plaintiffs' expert testimony (MSJ at 2.), which the Court declined to do.

- 11 -

1   evidence." *Thompson v. Better–Bilt Aluminum Prods. Co.,* 832 P.2d 203, 211 (Ariz. 1992).

2   In determining whether a defendant exhibited an "evil mind," courts consider "the nature

3   of the defendant's conduct, including the reprehensibility of the conduct and the severity

4   of the harm likely to result, as well as the harm that has occurred [in addition to] [t]he

5   duration of the misconduct, the degree of defendant's awareness of the harm or risk of

6   harm, and any concealment of it." *Id.* at 556. The primary question where punitive damages

7   are concerned is motive, because gross negligence and reckless disregard are not

8   enough. *Volz v. Coleman Co., Inc.,* 748 P.2d 1191, 1194 (Ariz. 1987). Because defendants

9   rarely admit to an "evil mind," improper motive is often inferred from sufficiently

10  oppressive, outrageous, or intolerable conduct as well as defendant's conscious and

11  deliberate disregard of the interest and rights of others. *Id.*

12          There are multiple issues of fact yet to be resolved that preclude summary judgment.

13  Plaintiffs contend that Aramark knew that the wake generated from its boats posed a

14  substantial risk to other boats but did not take sufficient steps to mitigate the risk. As

15  discussed, *supra*, some of the evidence relevant to that claim may not be admissible at trial.

16  However, the Court already has determined that there are internal Aramark emails

17  discussing the wakes' risk that are admissible. (PSOF ¶ 30, Ex. I at 24; ¶ 88, Ex. M at

18  57:14-58:1; ¶ 89, Ex. M at 60:7-61:3; Doc. 73-2 at 8, 14-15.) These emails are sufficient

19  evidence of Aramark's knowledge as to the potential dangers posed by their boats' wakes

20  to create an issue of fact regarding Plaintiffs' punitive damages claim. If a jury finds that

21  Aramark was aware of these risks but declined to implement any mitigation measures, it

22  could find that Aramark showed a conscious and deliberate disregard for other boaters. *Id.*

23  Aramark's Motion for Summary Judgment is accordingly denied.

24          **IT IS THEREFORE ORDERED** granting in part and denying in part Plaintiffs'

25  Motion to Strike Expert Reports, Testimony and Video Reenactments (Doc. 72), as set

26  forth above;

27          **IT IS FURTHER ORDERED** granting in part and denying in part Defendant's

28  Motion to Exclude Expert Testimony of John Sutton (Doc. 73), as set forth above;

1    **IT IS FURTHER ORDERED** granting in part and denying in part Defendant's

2  Motion and Points and Authorities to Exclude Expert Testimony of Joe Derie (Doc. 74),

3  as set forth above;

4    **IT IS FURTHER ORDERED** denying Defendant's Motion for Summary

5  Judgment Re: Negligence (Doc. 75);

6    **IT IS FURTHER ORDERED** denying Defendant's Motion for Summary

7  Judgment Re: Punitive Damages (Doc. 75);

8    **IT IS FURTHER ORDERED** that Defendant shall file, not later than three weeks

9  before the final Pre-Trial Conference in this matter, Motions in Limine regarding the

10  exclusion of the alleged 28 prior incidents and prior Aramark litigations, as set forth above.

11    **IT IS FURTHER ORDERED** that Plaintiffs shall provide sources for all 28 of the

12  alleged prior incidents within 21 days of this Order, as set forth above.

13    **IT IS FURTHER ORDERED** that Plaintiffs' claims will proceed to trial, and the

14  Court will set a pre-trial status conference by separate Order.

15    Dated this 23rd day of April, 2021.

16

17    Honorable John J. Tuchi
      United States District Judge

18

19

20

21

22

23

24

25

26

27

28