**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Larry Meador, *et al.*, | No. CV-19-08345-PCT-JJT |
| Plaintiffs, | **ORDER** |
| v. | |
| Aramark Sports and Entertainment Services LLC, | |
| Defendant. | |

After holding a bench trial from November 15 through November 19, 2021 (Docs. 152, 153, 156, 160, 164), the Court now provides its Findings of Fact and Conclusions of Law. In this Order the Court also will resolve Plaintiff's post-brief seeking emotional distress damages under the "Zone of Danger" doctrine (Doc. 177), to which Defendant filed a Response (Doc. 180) and Plaintiff filed a Reply (Doc. 181).

## I.      BACKGROUND

In this dispute, Plaintiffs Larry and Annette Meador ("the Meadors") sued Defendant Aramark Sports and Entertainment Services LLC ("Aramark") alleging negligence and seeking punitive damages. (Doc. 1.) Defendant filed a Counterclaim against Plaintiff/Counter-Defendant Larry Meador seeking equitable indemnity and contribution. (Doc. 44.)

On September 27, 2019, Larry Meador ("Mr. Meador") was operating his 29-foot Hallett 290 powerboat on Lake Powell, in the Navajo Canyon area. Also on board the boat were Annette Meador ("Ms. Meador"), Emily Lewis, Charisse Lewis, and Maeson Lewis.

Five other members of the Lewis family were on jet skis behind the boat. As Plaintiffs traveled up the channel approaching the right-hand turn into the canyon, the 76-foot M/V Desert Shadow (the "Desert Shadow"), owned by Aramark and operated by Captain Phil Anderson, rounded the left turn to exit the canyon, moving in the opposite direction of Plaintiffs' boat, and passed Plaintiffs' boat on its left (port) side. As the Desert Shadow passed the Meador boat, it generated a wake. Upon impact with the wake, the bow of the Hallett rose into the air before crashing back down onto the water. Ms. Meador suffered a thoracic fracture at her T-11 and T-12 vertebrae and was taken by air ambulance to a hospital in St. George, Utah.

Plaintiffs contend that their boat was to the far-right (starboard) side of the channel and allege that the Desert Shadow was not properly positioned in the channel. Plaintiffs claim that Aramark's operation of its boat was negligent and Aramark is liable for Ms. Meador's injuries. Plaintiffs also argue that Aramark was on notice that its tour boats generated dangerous wakes, and therefore punitive damages are appropriate. Defendant disputes Plaintiffs' claims and counters that Mr. Meador's negligent operation of his boat caused the accident.

In a prior Order (Doc. 92), the Court denied Aramark's Motion for Summary Judgment, finding that there were material issues of fact as to multiple elements of Plaintiffs' claims and Defendant's counterclaims. The Court held a bench trial on these issues from November 15 through November 19, 2021. In conjunction with the bench trial, the parties filed Trial Memoranda (Docs. 129, 132) and Proposed Findings of Fact and Conclusions of Law (Docs. 130, 131).

## II.    FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A.    Applicable Law

This case was brought under the Court's admiralty jurisdiction, so federal maritime law applies. *East River S.S. Corp. v. Transamerica Delval Inc.*, 496 U.S. 858, 864 (1986). Federal admiralty law preempts state law, but federal courts may apply state law by express or implied reference where the federal admiralty law is incomplete. *See Baggett v.*

*Richardson*, 473 F.2d 863, 864 (5th Cir. 1973). The Ninth Circuit has explained that "the general rule on preemption in admiralty cases is that states may supplement federal admiralty law as applied to matters of local concern, so long as state law does not *actually conflict* with federal law or *interfere* with the *uniform working* of the maritime legal system." *Pacific Merchant Shipping Ass'n v. Aubry*, 918 F.2d 1409, 1422 (9th Cir. 1990) (emphasis in original).

### B.    Negligence

The elements of negligence at admiralty are generally the same as in a common law negligence action— (1) the defendant had a duty of reasonable care; (2) that duty was breached; (3) causation; and (4) damages. *Samuels v. Holland Am. Line-USA, Inc.*, 656 F.3d 948, 953 (9th Cir. 2011).

In admiralty, a party's duty of care can be derived from "(1) duly enacted laws, regulations, and rules; (2) custom; or (3) the dictates of reasonableness and prudence." *Galentine v. Estate of Stekervetz*, 273 F. Supp. 2d 538, 544 (D. Del. 2003) (citing *Pennsylvania R. Co. v. The Marie Leonhardt*, 202 F. Supp. 368, 375 (E.D. Pa. 1962)). The Inland Rules of Navigation, 33 C.F.R. § 83.01 *et seq.*, provide "rules of the road" that apply "to all vessels upon the inland waters of the United States[.]" 33 U.S.C. § 2071; 33 C.F.R. § 83.01(a).

For determining causation, the *Pennsylvania* Rule offers guidance. *See The Pennsylvania*, 86 U.S. 125 (1873). The *Pennsylvania* Rule provides that "when a statutory rule intended to prevent an admiralty accident exists and a party violates that statute injuring a party whom the statute was created to protect, the violating party, to avoid liability, must show that its violation *could not have been* the cause of the accident." *Pearce v. U.S.*, 261 F.3d 643, 648 (6th Cir. 2001) (emphasis in original) (citing *The Pennsylvania*, 86 U.S. at 136). In the Ninth Circuit, "clear and convincing evidence suffices for a showing in satisfaction of the *Pennsylvania* rule." *Trinidad Corp. v. S.S. Keiyoh Maru*, 845 F.2d 818, 825 (9th Cir. 1988).

Proportional division of liability applies to all admiralty cases. *See, e.g. Phillips Petroleum Co. v. Stokes Oil Co., Inc.*, 863 F.2d 1250, 1255 (6th Cir. 1988) ("Damages in admiralty cases are generally allocated among tortfeasors based on comparative fault."). Thus, a court must first determine whether the defendant's negligence was a substantial cause of the injury at issue, and if that is the case, the court must then allocate damages to the plaintiff in the amount of the total loss, minus the damages attributable to the plaintiff's own proportionate fault, if any.

### 1. Duty

At a general level, the parties appear to agree Defendant owed Plaintiffs a duty of care. *See In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 211 (5th Cir. 2010) ("Under Maritime law, a plaintiff is owed a duty of ordinary care under the circumstances."). However, the parties dispute whether certain rules and regulations also imposed a duty upon Aramark. The parties agree that the Inland Rules of Navigation ("Inland Rules"), 33 C.F.R. § 83.01 *et seq.* apply, but they disagree as to which rules are pertinent.

Plaintiffs' expert, Captain J.R. Sutton, testified that Inland Rules 2, 5, 6, 7, 9, and 34(e) applied to the Desert Shadow. (Transcript ("Tr.")[1] 11/15/21, 10:22:38, 10:25:07, 10:28:09, 10: 20:45.)

Captain Sutton referred to Rule 2 as the "prudent seaman rule," which requires mariners to follow the other Inland Rules. (Tr. 11/15/21, 10:22:38.) Rule 2 states:

> (a) Nothing in these Rules shall exonerate any vessel, or the owner, master, or crew thereof, from the consequences of any neglect to comply with these Rules or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case.

> (b) In construing and complying with these Rules due regard shall be had to all dangers of navigation and collision and to any special circumstances, including the limitations of the vessels involved, which may make a departure from these Rules necessary to avoid immediate danger.

---

[1] Parties did not request final transcripts post-trial. Thus, for clarity, the Court cites testimony using the dates and time-codes from the unofficial versions of the transcripts.

33 C.F.R. § 83.02. Parties do not dispute the application of this rule. Rule 5, the look-out rule, states:

> Every vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision.

33 C.F.R. § 83.05. Likewise, parties do not dispute whether this rule applies. Rule 6, the safe speed rule, requires that:

> Every vessel shall at all times proceed at a safe speed so that she can take proper and effective action to avoid collision and be stopped within a distance appropriate to the prevailing circumstances and conditions.

33 C.F.R. § 83.06. The rule sets out factors that should be taken into account in determining safe speed, which include visibility, traffic density, the vessel's maneuverability, wind, current, and navigational hazards. 33 C.F.R. § 83.05(a)(i)-(vi). Again, parties do not dispute that Rule 6 applies here. Rule 7, which covers the risk of collision, requires:

> (a) Every vessel shall use all available means appropriate to the prevailing circumstances and conditions to determine if risk of collision exists. If there is any doubt such risk shall be deemed to exist.
>
> …
>
> (c) Assumptions shall not be made on the basis of scanty information, especially scanty radar information.

33 C.F.R. § 83.07. Parties do not dispute that Rule 7 applies. Finally, Rule 9, which discusses narrow channels, states in relevant part:

> (a)(i) A vessel proceeding along the course of a narrow channel or fairway shall keep as near to the outer limit of the channel or fairway which lies on her starboard side as is safe and practicable.
>
> …
>
> (f) A vessel nearing a bend or an area of a narrow channel or fairway where other vessels may be obscured by an intervening obstruction shall navigate

with particular alertness and caution and shall sound the appropriate signal prescribed in Rule 34(e) (§ 83.34(e)).

33 C.F.R. § 83.09(a), (f). Rule 34(e) states:

A vessel nearing a bend or an area of a channel or fairway where other vessels may be obscured by an intervening obstruction shall sound one prolonged blast. This signal shall be answered with a prolonged blast by any approaching vessel that may be within hearing around the bend or behind the intervening obstruction.

33 C.F.R. § 83.34(e).

Plaintiffs and Defendant disagree as to whether Rule 9 is applicable.[2] The Court ordered supplemental briefing on this issue post-trial. (Docs. 172, 173, 175, 176.) The determination of whether a channel is a "narrow channel" within the meaning of Rule 9 is a mixed question of law and fact for the district court. *Mike Hooks Dredging Co. v. Marquette Transp. Gulf Inland, L.L.C.*, 716 F.3d 886, 893 (5th Cir. 2013). Arguing that Rule 9 applies because Navajo Canyon is a narrow channel, Plaintiffs rely on *Mike Hooks*, where the Fifth Circuit found that although the Inland Rules do not define the term "narrow channel," they have generally found that the term includes "bodies of water that are less than 1,000 feet in width." *Id.* Defendant, on the other hand, cites several cases to suggest that courts typically look to a variety of factors to determine whether a waterway is a "narrow channel" within the meaning of Rule 9. (Doc. 173 at 4-5.) Defendant argues that because Navajo Canyon is a recreational, not a commercial waterway, and because boaters there do not observe a two-way traffic pattern, Navajo Canyon is not a narrow channel within the meaning of Rule 9. (Doc. 173 at 6-7.)

On average, the section of Navajo Canyon where the incident occurred is around 600 feet wide. (Tr. 11/17/21, 3:34:22; 11/18/21, 11:01:43.) While this fact cuts in favor of finding that Navajo Canyon is a narrow channel under *Mike Hooks*, the application of the rule is "not based on the physical dimensions of the body of water alone." *Weathers Towing*

---

[2] The Court notes that there is little to no Ninth Circuit law regarding the application of the narrow channel rule. In their post-trial briefing, both parties relied on only persuasive authority, most of which is over 40 years old.

*Inc. v. M/V Herman Pott*, 570 F.2d 1295, 1295 (5th Cir. 1978). Thus, the Court's analysis does not stop here. *Weathers* also found no error where the district court, in determining whether a channel was "narrow" within the meaning of Rule 9, considered the fact that a "vessel must change course over 180 degrees to navigate the bend." *Id.* Here, the Desert Shadow did not have to turn a full 180 degrees, but due to the high canyon walls, it did have to round a blind turn, which also weighs in favor of finding that Navajo Canyon is a narrow channel. (*See, e.g.*, Tr. 11/15/21, 10:02:27.) Finally, although Navajo Canyon is not a solely commercial waterway, there is no denying that Aramark is using it for a commercial purpose. (*See, e.g.*, Tr. 11/17/21, 8:36:40 (Robert Knowlton) (testifying that Aramark, as the concessionaire for the National Park Service, runs tours on Lake Powell).) In fact, Aramark is required to operate a daily tour schedule, and prior to the COVID-19 pandemic the "Canyon Adventure Tour" through Navajo Canyon would run twice each day during peak season, as it did on September 27, 2019. (Tr. 11/17/21, 8:37:00, 9:23:31 (Robert Knowlton); Ex. 54.) But the Court acknowledges that this commercial use is distinguishable from the commercial uses in many of the precedent cases, which involve heavily trafficked shipping channels.

Defendant points out that in *Skibs*, the Southern District of New York declined to apply the narrow channel rule, finding that the "character of navigating use to which the water is put is such that it is not and could not be defined as a Narrow Channel." *Skibs A/S Siljestad v. S/S Mathew Lukenbach*, 215 F. Supp. 667, 682 (S.D.N.Y. 1963). But Defendant's analysis of the "character" of the navigating use of Navajo Canyon overlooks several key distinctions between this case and *Skibs*. First, the body of water at issue in *Skibs* varied from one and a quarter to six miles wide. *Skibs*, 215 F. Supp. at 681. As mentioned *supra,* Navajo Canyon is around 600 feet wide. Second, Defendant cites the *Skibs* Court's reasoning that "channels within the rule are bodies of water navigated up and down in opposite directions . . . harbor waters with piers on each side, where the necessities of commerce require navigation in every conceivable direction, up and down, across, and up and down between piers on the same side, cannot be considered as narrow channels."

1    *Id.* (citing *The No. 4*, 161 F. 847, 850 (2d. Cir. 1908)). In applying this rule to the facts

2    before it, the *Skibs* Court observed that "there is in the summer time considerable small

3    craft crossing in all different directions." *Skibs A/S Siljestad v. S/S Mathew Lukenbach*, 215

4    F. Supp. 667, 681 (S.D.N.Y. 1963). Defendant attempts to equate the activity in *Skibs* to

5    the activity in Navajo Canyon. Mr. Meador testified that the canyon has "lots of places to

6    kind of pull off to the side and swim and just kind of hang out," and Captain Anderson

7    testified that jet skiers often "play" in the wakes generated by the Desert Shadow.

8    (Tr. 11/15/21, 9:59:04 (Mr. Meador); 11/17/21, 10:47:45 (Captain Anderson).) However,

9    Defendant fails to mention that Mr. Meador also testified that he kept to the right side of

10    the canyon, and he did not see any traffic coming towards him in his "lane."[3] (Tr. 11/15/21,

11    10:04:36.) Mr. Meador further explained that he would not have expected anyone to

12    approach him in his lane, because the right side is the "safe and appropriate place to be in

13    that particular canyon," noting its narrowness. (Tr. 11/15/21, 10:05:06.) Even Captain Phil

14    Anderson testified that he would have kept to the right when exiting the canyon.

15    (Tr. 11/17/21, 10:45:18.) Whether the Court finds that statement credible is discussed

16    below, but it suggests that Captain Anderson was aware of a traffic pattern in the canyon,

17    as was Mr. Meador. Thus, the evidence presented in this case suggests that Navajo Canyon

18    is a body of water navigated up and down in opposite directions. [4]

19    However, the Court hesitates to determine that Navajo Canyon is a narrow channel

20    for a reason that neither party explicitly mentions in its briefing: most of the precedent

21    cases involve vessels that are nearly as large as the channels themselves. For example, in

22    *SCF Waxler Marine LLC v. M/V ARIS T*, the court held that the vessels involved in that

---

23
24    [3] Mr. Meador did testify that the Desert Shadow was in his "lane." (*See* Tr. 11/15/21, 10:18:38.) The Court addresses this point *infra* in II.B.2.

25    [4] Defendant cites an article written by Craig H. Allen for its argument that generalizations
26    about the width of a channel are not meaningful. (Doc. 176.) Craig H. Allen, *Taking Narrow Channel Collision Prevention Seriously to More Effectively Manage Marine*
27    *Transportation System Risk*, 41 J. Mar. L. & Comm. 1, 17 (2010). But the article suggests that generalizations about traffic patterns are not dispositive either. *Id.* ("[T]he presence of crossing traffic, even frequent crossing traffic, does not preclude a finding that a waterway
28    qualifies as a narrow channel.").

case should have treated the area of the Mississippi River in question as if it were a narrow channel despite the fact that it was 2,000 feet wide, but also noted that the smallest vessel involved was 700 feet in length. 477 F. Supp. 3d 728, 763 (E.D. La. 2019). Likewise, in *Weathers*, the channel was 1,200 feet wide, but the vessel in question was 1,143 feet long and 175 feet wide. 570 F.2d 1294, 1296. Although Navajo Canyon is only 600 feet wide, the Desert Shadow is just 76.1 feet long and 19.3 feet wide. (Doc. 130 ¶ 22.) At trial, the Court heard no evidence suggesting that vessels larger than the Desert Shadow are frequently present in Navajo Canyon.

The applicability of Rule 9 is a close issue. Some facts suggest that it would be proper to find that Navajo Canyon is a narrow channel—the canyon is 600 feet wide and includes blind turns; Aramark's presence in the waterway is for a commercial purpose; the waterway is not a harbor and there are no piers; and the evidence indicates that traffic predominantly keeps to the right side of the road. However, to hold as much would be an extreme departure from precedent in other districts. Those cases involve channels ranging from equal in width to three times the width of Navajo Canyon, but the vessels that frequently navigate those channels are—at the low end of the spectrum—ten times larger than the Desert Shadow. The Court finds that Navajo Canyon is not a narrow channel within the meaning of Rule 9. Therefore, neither Rule 9 nor Rule 34(e) applies.

In addition to the Inland Rules, Plaintiffs contend that Arizona and Utah laws are applicable. (Doc. 132 at 5.) Arizona law requires that:

> No person shall operate a watercraft in excess of the posted limit or at a speed greater than is reasonable and prudent under the conditions and having regard to the actual and potential hazards then existing. In every event, speed shall be so controlled as may be necessary to avoid colliding with any person or other watercraft, swamping other watercraft or otherwise endangering the lives or property of other persons.

A.R.S. § 5-343 (2012). Utah law provides that "[t]he operator of a motorboat is responsible for any damage or injury caused by the wake produced by the operator's motorboat." UT Code § 73-18-15.1(11) (2016) (Ex. 66). It also states that operators of vessels "may not

exceed a wakeless speed" when within 150 feet of another vessel. Utah Code § 73-18-15.1(10)(a) (2016). Plaintiffs point out that Aramark has acknowledged that its captains must follow Arizona law, Utah law, and federal law when navigating Lake Powell. (Doc. 132 at 5; Deposition of Tony Anderson ("Anderson Dep.") 57:2-6.) Defendant, on the other hand, argues that Arizona and Utah state boating laws are preempted by the Inland Rules (Doc. 130 ¶ 10.)

In *St. Hilaire Moye v. Henderson*, the case on which Defendant relies to advance its preemption argument, the Eighth Circuit acknowledged that federal courts sitting in admiralty need not "invariably refuse to recognize and enforce a liability which the State has established in dealing with a maritime subject." 496 F.2d 973, 980 (8th Cir. 1974), cert. denied 419 U.S. 884 (1974), quoting *Just v. Chambers*, 312 U.S. 383, 387-88 (1941). Moreover, *St. Hilaire Moye* is distinguishable. In that case, the Eighth Circuit found that application of an Arkansas statue, which imposed a "willful and wanton" standard for recovery, would disrupt the uniformity of the admiralty law, and was in direct conflict with the federal negligence standard. *Id.* at 981. The Court also noted that the Arkansas rule would "defeat the rights of persons injured by the negligence of boat operators on navigable waters." *Id.* In fact, it is this portion of the reasoning in *St. Hilaire Moye* that courts have most often applied. *See, e.g.*, *Byrd v. Byrd*, 657 F.2d 615, 617-18 (4th Cir. 1981) (reasoning that a state law should not be applied where it would "defeat an otherwise meritorious maritime cause of action."). Here, the Arizona and Utah laws are not in direct conflict with the Inland Rules, nor do they function to defeat a federal right of recovery. It follows that these laws are not preempted. However, Navajo Canyon sits in Arizona, so Arizona law, not Utah law, is relevant to the instant matter.

Tony Anderson (by deposition) and Robert Knowlton (at trial) both testified that Aramark's tour boat captains are expected to adhere to state and federal law when conducting tours on Lake Powell. (Anderson Dep. 56:7-57:6; Tr. 11/17/21, 9:33:59.) While courts with admiralty jurisdiction have acknowledged that failure to comply with an internal policy could be evidence of a failure to exercise due care, this evidence alone is

not dispositive. *See In re City of New York*, 475 F. Supp. 2d 235, 240-41 (E.D.N.Y. 2007). Further, Aramark's internal policies and procedures were not introduced as evidence at trial.[5] Thus, even if such an internal policy exists, it does not weigh into the Court's assessment of Defendant's duty.

Accordingly, the Court finds that Defendant owed Plaintiffs a duty of ordinary care under the circumstances and determines that Arizona state law and Inland Rules 2, 5, 6, and 7 apply.

### 2.      *Breach of Duty*

At trial, Plaintiffs presented evidence that Defendant breached its duty of ordinary care under the circumstances, violated Inland Rules 2, 5, 6, and 7, and also violated Arizona state law.[6]

There is a great deal of overlap in the evidence required to find that Defendant breached its duty to Plaintiffs under each of the criteria described above, so the Court first provides its findings of fact on the events leading up to the Meador boat's impact with the wake. The Court's findings of fact regarding the impact itself are discussed in the next section of this Order in the context of causation.

On the afternoon of the accident, Mr. Meador was driving his 29-foot Hallett boat up the channel entering Navajo Canyon. Ms. Meador and Maeson Lewis were seated in the bow of the boat. (Tr. 11/15/21, 1:51:01.) Charisse Lewis and Emily Lewis were seated towards the stern of the boat. (Tr. 11/15/21, 1:51:08.) Five jet skis, ridden by members of the Lewis family, trailed the Meador boat. (Tr. 11/15/21, 2:20:05.)

Although Mr. Meador does not know how fast he was going, he testified that he was traveling at a "safe, controlled" speed. (Tr. 11/15/21, 10:03:59.) Mr. Meador also testified that as the Hallett approached the turn, he may have slowed down, because this was a turn that required "immense caution." (Tr. 11/15/21, 10:25:31.) Thomas O'Brien

---

[5] The Court declines to solely rely on testimony to determine the existence of the internal policy.

[6] Plaintiffs also argue that Defendant violated Utah state law, Rule 9, and Rule 34(e), but because the Court determined that those laws and regulations do not apply, *supra*, the Court does not consider them further.

("Mr. O'Brien"), a passenger on the Desert Shadow, believes the Meador boat was traveling between 25 and 35 miles per hour ("mph"). (Deposition of Thomas O'Brien ("O'Brien Dep.") 14:17-19.) Others testified that the Hallett was traveling at a "cruising" speed. (Tr. 11/15/21, 2:19:33 (Maeson Lewis); Deposition of Charisse Lewis ("Charisse Lewis Dep.") 18:1-10.) Defendant's expert Tullio Celano ("Mr. Celano") opined cruising speed would be between 30 and 50 mph in a boat like Mr. Meador's, due to the boat's decreased performance at lower speeds. (Tr. 11/17/21, 4:51:02.) However, Wesley Lewis, who was on a jet ski behind the Meador boat, testified he never traveled faster than 40 knots—roughly 46 mph—on the jet ski, and there was no testimony to suggest that the Meador boat was traveling close to the maximum speed for the jet skis. (Deposition of Wesley Lewis ("Wesley Lewis Dep.") 22:1-19.) Mr. O'Brien also testified during his deposition that the boat and the jet skis "seemed like they were all trying to get to – to get somewhere together." (O'Brien Dep. 14:25-15:3.) Thus, the Meador boat must have been traveling at the lower end of its "cruising" range. All accounts considered, the Court finds it most credible that the Hallett was traveling between 25 and 30 mph as it approached the bend, and possibly slowed even more as it neared the turn.

As the Hallett made its way down the right-hand side of the channel, Maeson Lewis testified that it was between 20 and 40 yards from the wall of the canyon. (Tr. 11/15/21, 2:37:11.) Colby Lewis analogized to a two-lane road to describe the position of the Hallett, explaining that it would have been "on the white line or in the rumble strips." (Colby Lewis Dep. 23:5-18.) The Court finds both of these accounts credible, and also taking into account the width of the canyon, finds that the Meador boat was most likely between 20 and 50 yards from the canyon wall on its right.

Before the Meador boat reached the right turn into the canyon, the bow of the Desert Shadow came into view. (Tr. 11/15/21, 10:06:03, 2:00:48; 11/18/21, 10:36:07; Ex. 7.) The Desert Shadow crossed the path of the Meador boat as it turned left into the channel. (Tr. 11/15/21, 2:01:57, 2:45:41.)

None of Plaintiffs' witnesses were able to estimate the speed of the Desert Shadow, claiming only that it was "fast." (*See, e.g.*, Tr. 11/15/21, 2:04:04, 2:06:28 (Maeson Lewis testified that the larger vessel was "going way too fast," and that "they were going faster than they were supposed to be.").) Captain Phil Anderson, who was piloting the Desert Shadow that day, estimates he "might have been doing 15 miles an hour" coming around the bend and was possibly on a plane as he approached the turn. (Tr. 11/17/21, 10:46:50-10:47:17.) He also noted that he did not recall the Desert Shadow's top speed because he never went that fast. (Tr. 11/17/21, 10:46:50-10:47:17.) Although the Desert Shadow may have been on a plane as it approached the left turn into the channel, Captain Anderson testified that the Desert Shadow was not at plane speed when he first noticed the Meador boat "heading towards the back" of his vessel. (Tr. 11/17/21, 10:46:50.) On this point, Captain Anderson's testimony is somewhat corroborated by the testimony of Mr. O'Brien, who believes the Desert Shadow was traveling between 8 and 10 mph at the time he witnessed the accident. (O'Brien Dep. 18:19-22.) Based on both Mr. O'Brien and Captain Anderson's accounts, the Court finds the Desert Shadow was on a plane as it approached the left turn, slowed to at or around 15 mph as it entered the turn, and continued to slow as it turned left, eventually reaching a speed of around 10 mph.

As the Desert Shadow crossed the path of the Meador boat, it generated a wake. Witness accounts vary drastically regarding the size of this wake. Those who were on the Hallett estimate that the wake was much larger than those who observed it from a different vantage point. For example, Mr. Meador estimated that the wake was approximately 6 feet in height and Maeson Lewis estimated that the wake was up to 20 feet tall. (Tr. 11/15/21, 11:52:44, 2:03:05.) Ms. Meador described the experience of hitting the first wake:

> I remember seeing how deep it was after the first wave and thinking we're going to drown. All that water from the next wave was gonna come in because it was a huge wall. It was deep and then it was a big wall and I thought all that water's going to come in the boat.

(Deposition of Annette Meador ("Annette Meador Dep.") 146:5-10.) In contrast, Mr. O'Brien, who saw the wake from on board the Desert Shadow, testified that it was "two or three" feet. (O'Brien Dep. 19:7-13.)

At trial the Court also heard expert testimony on the size of the wake. Defendant's expert Mr. Celano utilized a hydrodynamic calculation method to create models predicting the height of the Desert Shadow's wake at various speeds. (Tr. 11/17/21, 4:09:26, 4:14:44, 4:25:28.) The "inputs" that Mr. Celano's model considered included the dimensions of the Desert Shadow, its dead rise angle, its weight (taking into account fuel and passengers), and the water's depth. (Tr. 11/17/21, 4:25:38.) Mr. Celano explained that a vessel like the Desert Shadow will create the largest possible wake as it slows down from plane speed.[7] (Tr. 11/17/21, 4:29:23.) This speed is called "hump speed" and occurs just before a vessel drops off plane. (Tr. 11/17/21, 4:29:23.) However, based on Mr. Celano's calculations, even during this "transitional period," which he contends is around 14 knots (approximately 16 mph), the wake generated would not be much larger than 3.3 feet. (Tr. 11/17/21, 4:30:39-50, 4:31:05.) The Court also saw video footage taken by Defendant's expert John Curry ("Mr. Curry") in his attempt to recreate Mr. Meador's account of the accident. (Ex. 115.) Out of all the test runs Mr. Curry performed, the largest wake that was generated was 2.5 feet in height. (Tr. 11/17/21, 1:30:47, 1:40:52.) However, in the video taken by Mr. Curry from the smaller boat, it became clear how one could perceive that a 2.5-foot wake as much larger than that. (*See* Ex. 115.)

With this expert testimony in mind, all the percipient witness accounts make sense. As the Court found above, the Desert Shadow slowed from plane speed to around 15 mph as or just before it rounded the turn. This means the vessel was in the transitional period described by Mr. Celano, where it will displace the most water, generating the largest possible wake, at the time it crossed the path of the Meador boat. This wake would have

---

[7] *See also* Tr. 11/17/21, 4:11:30-4:15:40, 4:32:04-4:32:29. Mr. Celano explained that as a boat travels through the water, the part of the hull in contact with the water is called the "wetted surface," which creates viscous drag. When a boat is "on plane" a relatively small portion of the hull is in contact with the water, minimizing a wave's impact on the hull, resulting in smaller wakes.

seemed "huge" from a Hallett passenger's vantage point. Therefore, the evidence indicates that the wake was around 3.3 feet, and perhaps slightly larger.

Captain Anderson also testified about the Desert Shadow's position relative to the Meador boat:

> I would have been to the right of mid-channel if you were to draw a line through the middle of that channel. I would have been much closer to the canyon wall on the right and I always stayed up there until I had a clear view down the channel out towards the lake . . . I really don't recall seeing that small boat up until the time my first recollection of it was, it was heading towards the back of the Desert Shadow. And at that time I was close to the northern wall, the right-hand wall up there because I was concerned about watching the boat and staying away from that wall.

(Tr. 11/17/21, 10:44:22, 10:45:18.)

To the contrary, at the time of the accident, Mr. O'Brien placed the Desert Shadow in the center of the channel. (O'Brien Dep. 17:3-11 ("We were right in -- smack dab in the middle of the channel."). Maeson Lewis and Colby Lewis placed the Desert Shadow in the middle of the channel as well, if not on the same side of the channel as the Hallett. (Tr. 11/15/21, 2:01:57 (Maeson Lewis), 2:45:48 (Colby Lewis).) Mr. Meador, on the other hand, believes the Desert Shadow was fully on his side of the channel. (Tr. 11/15/21, 10:24:01; Ex. 23.) Despite the testimony of Captain Anderson and Mr. Meador, the Court finds the accounts placing the Desert Shadow in the middle of the channel are the most credible. As noted above, Captain Anderson testified that when he first saw the Meador boat he was no longer at plane speed. To reiterate, Mr. Celano explained that the "hump speed," or the speed right before the Desert Shadow drops off of a plane is around 16 mph, and Captain Anderson testified that he may have been traveling around 15 mph around the turn, which the Court found credible. It follows that Captain Anderson must have at least begun the blind turn into the channel to have dropped off of plane when the Hallett came into his field of vision. (Tr. 11/17/21, 10:46:50.)

Because Captain Anderson would not have seen the Meador boat before he started turning, he likely believed the coast was clear, and positioned himself in the middle of the

channel. Not only is this finding supported by testimony, but it also would have presented the most efficient path for the Desert Shadow as it exited the channel. In the same vein, given the geography of the channel, had the Desert Shadow been maintaining a course on the left side of the channel prior to the turn and it had started the turn before the Meador boat came into view, the Hallett would not have approached the Desert Shadow's wake at a 90-degree angle, which, as discussed in more detail later, the parties seem to agree that it did. (Tr. 11/15/21, 11:37:53; *see also* Ex. 23.) Further, as the Court also explains below, the Desert Shadow must have been in the middle of the channel and not on the right side of the channel for it to have come as close to the Meador boat as indicated by credible witness testimony. Thus, the Court finds the weight of the evidence indicates that the Desert Shadow maintained a course through the middle of the channel.

Eyewitnesses also provide different accounts as to how close the Desert Shadow came to the Hallett. In her deposition, Maeson Lewis, who testified she is familiar with yardages from her hunting experience, estimated that the Desert Shadow was between 30 and 40 yards from the Meador boat when its bow first came into view, but at trial she acknowledged that "it was just so fast that there really wasn't time for all of that." (Deposition of Maeson Lewis ("Maeson Lewis Dep.") 56:15-57:1; Tr. 11/15/21, 2:17:33.) Oakley Lewis, who was on a jet ski behind the Meador boat, testified that the Desert Shadow was 60 to 90 feet away when it passed him. (Deposition of Oakley Lewis ("Oakley Lewis Dep.") 19:6-24.) Mr. O'Brien testified that the Meador boat was about "20 feet from the port side" of the Desert Shadow. (O'Brien Dep. 17:15-19.) Ms. Meador testified that she was unsure of how far away the Desert Shadow was but remembered "seeing it was full of people." (Annette Meador Dep. 144:22.) The record's ambiguity on this issue is compounded by the fact that some witnesses, like Oakley Lewis, provided accounts of how far away the Desert Shadow was at the time it passed them, whereas other witnesses, like Maeson Lewis, testified to the distance between the Hallett and the Desert Shadow at the time the bow of the Desert Shadow appeared.

Although the amount of time that elapsed between when the Desert Shadow came into view and when the Hallett collided with its first wake could prove helpful for determining the distance between the boats, these accounts also vary wildly. Colby Lewis, who was between 600 and 800 feet behind the Meador boat testified that "10, 15 maybe" seconds passed before the first impact. (Tr. 11/15/21, 2:56:16, 2:56:58.) Mr. Meador testified that he had "just seconds to try and react," before the Hallett hit the wake. (Tr. 11/15/21, 10:13:13.) During her deposition Maeson Lewis testified that 15 to 30 seconds passed from the time she saw the front of the Desert Shadow until the Meador boat hit the wake. (Maeson Lewis Dep. 66:20-67:2.) But at trial, Plaintiffs' counsel directed Maeson Lewis to close her eyes, envision the Desert Shadow coming into view, and then tell the Court when she felt as if the Meador boat hit the wake. (Tr. 11/15/21, 2:33:37.) Six seconds elapsed. (Tr. 11/15/21, 2:34:17.) The Court has already found that when the Desert Shadow began the turn, it was going around 15 mph, but slowed during the turn. The Meador boat was likely traveling between 25 and 30 mph at this time, but Mr. Meador also may have slowed as he approached the turn. If speeds were constant, this means that the closing speed was around 40 miles per hour, or 58 feet per second. However, without expert testimony on wake speed, the Court declines to apply its own math on closing speed to determine the distance between the Hallett and the Desert Shadow. The Court provides the above analysis only to place the events into context—the collision with the wake happened quickly, and the Meador boat rapidly neared the Desert Shadow, which may have led witnesses to underestimate the distances between the two.

The Court finds that the Desert Shadow was most likely around 100 yards (300 feet) from the Meador boat when it first came into view for the following reasons: (1) the channel is, on average, approximately 600 feet wide; (2) the Court found that the Desert Shadow was in the middle of the channel; and (3) Mr. Meador testified he may have been slowing down, meaning that he was very near the turn. (*See also* Ex. 23.) When the Desert Shadow passed the Meador boat on its port side, it was likely between 40 and 50 yards from the Meador boat. This is because the Court found that the Meador boat was between 20 and 50

yards (60-150 feet) from the canyon wall, and the Desert Shadow is 19.3 feet wide, so traveling in the middle of the channel, it would leave a "lane" of approximately 290 feet. (Doc. 130 ¶ 22.) On these facts, if the Meador boat were 150 feet from the wall, for example, this means that the Desert Shadow gave the smaller vessel a berth of around 140 feet, or around 46 yards.

With this narrative and the resultant findings of fact in mind, the Court considers each alleged breach of duty.

<em>a.    Rule 5</em>

Plaintiffs take the position that Defendant did not comply with Rule 5 of the Inland Rules of Navigation. Captain Sutton, Plaintiffs' expert witness, explained that this rule highlights the importance of keeping a proper lookout, particularly in congested areas, to ensure that one does not pass too closely or create wakes that may harm others. (Tr. 11/16/21, 10:25:38.) Captain Sutton opined that Captain Anderson could not have been keeping a lookout as he navigated the Desert Shadow, noting that in his deposition, Captain Anderson stated that he heard from a deckhand that one of the jet skis had struck the Meador boat. (Tr. 11/16/21, 10:26:58.)

However, the Court determines Rule 5 was not violated for several reasons. First, Plaintiff did not produce sufficient evidence indicating that the rule was violated. Where courts have found that Rule 5 was violated, they have been able to point to substantially more facts than are available in this case to show that there was indeed a violation. *See, e.g.*, *Maya Special Maritime Enterprise v. Crochet*, No. 4:13-CV-1871, 2016 WL 4190153, at *13 (S.D. Tex. Aug. 9, 2016) (finding Rule 5 was violated where evidence at trial indicated that no crew member informed the lookout after identifying a possible target). In *Holt v. Brown*, for example, there was evidence that the lookout abandoned his post to retrieve an item that had fallen. *Holt v. Brown*, 185 F. Supp. 3d 727, 735-36 (D.S.C. 2016). Because the lookout left his post without asking another person to take over, the court determined his action was unreasonable and constituted a breach of duty. *Id.* at 736. Here, Captain Sutton appears to reason that because Captain Anderson learned of the collision

between the Meador boat and the jet ski from a crew member—an accident that took place after the Desert Shadow had already passed the Meador boat—he could not have been keeping a proper lookout. But without more information this fact is neither relevant nor sufficient to prove a violation of Rule 5.

Second, as Captain Sutton seems to acknowledge, the Desert Shadow rounded a blind turn before the accident in question took place. (*See* Tr. 11/16/21, 10:29:38.) By its nature, such a turn prevents even the most diligent of lookouts from seeing a potential hazard. In fact, Captain Sutton opined that Mr. Meador was keeping a proper lookout, but we heard in Mr. Meador's testimony that he did not see the Desert Shadow until its bow emerged from behind the blind corner. (Tr. 11/16/21, 10:26:29 (Captain Sutton); 11/15/21, 10:06:22 (Larry Meador).) This shows that Captain Sutton understands that a person can follow Rule 5, but also remain oblivious to a hazard until it comes into view. Further, expert testimony is not required to understand that a blind turn, such as the one in Navajo Canyon, presents a significant impediment to one's ability to perceive approaching traffic, even if he is maintaining a proper lookout.

For these reasons, the Court finds that Defendant did not violate Rule 5.

### b.    Rule 6

Plaintiffs also assert that Defendant violated Rule 6, the safe speed rule. Captain Sutton opined that the Desert Shadow was not operating at a safe speed, given the "close quarters" of Navajo Canyon. (Tr. 11/16/2021, 10:29:15.) Captain Sutton also testified that the "deep-V" hull design of the Aramark tour boats means that the boats produce excessive wake at speed. (Tr. 11/16/2021, 10:34:35.) Other witnesses for Plaintiffs testified that the Desert Shadow was moving "too fast." (*See, e.g.*, Tr. 11/15/21, 2:04:04, 2:06:28 (Maeson Lewis).)

The Court finds Defendant did not violate Rule 6. As the Court explained *supra*, the Desert Shadow was traveling at around 15 mph when it began the turn, and then slowed. There was no evidence presented at trial to show this speed was unsafe under the circumstances. In fact, the Court found that Mr. Meador, who testified that his speed was

safe and controlled, was traveling at a faster speed than the Desert Shadow. (Tr. 11/15/21, 10:03:59.) Captain Sutton's expert opinion incorrectly assumes that faster speeds mean larger wakes, so for a large wake to be produced, the Desert Shadow must have been traveling at an unsafe speed. However, Mr. Celano explained to the Court that based on his models, the opposite is true. As a vessel like the Desert Shadow moves faster, the wave energy is more spread out, meaning it needs less trim angle to create lift, resulting in a smaller wave. (Tr. 11/17/21, 4:32:29.) If the Desert Shadow were traveling at 24 mph, by Mr. Celano's calculations it would have generated only at 2.48-foot wake. This is significantly smaller than the approximately 3.3 foot wake the Court determined the Desert Shadow generated here, as it slowed down from plane speed. (Tr. 11/17/21, 4:28:25.)

Although it is conceivable that a speed that is too slow could be dangerous, and the Court acknowledges that slow speeds may be negligent under the right circumstances, these do not seem to be the circumstances at the heart of Rule 6. The rule states that a vessel should maintain a "safe speed so that she can take proper and effective action to avoid collision and be stopped within a distance appropriate to the prevailing circumstances and conditions." Plaintiffs did not cite to any case law suggesting that a vessel can violate Rule 6 by either slowing at an inopportune time or by moving too slowly and therefore generating a larger wake. Nor was the Court able to find any precedent suggesting as much in its own research. Without precedent to rest upon, the plain language of Rule 6 does not suggest that the fact that the Desert Shadow's slow speed resulted in a larger wake merits a finding that its speed was unsafe under the rule.

Thus, the Court finds that Defendant did not violate Rule 6.

### c.    Rule 7

The Court only briefly addresses Rule 7, which directs vessels to "use all available means appropriate to the prevailing circumstances and conditions to determine if risk of collision exists." 33 C.F.R. § 83.07. Captain Sutton opined that Rule 7 applies not only to the risk of collisions between vessels, but also collisions with wakes. (Tr. 11/16/21, 10:36:59.) Plaintiff's only proffered evidence that Rule 7 was violated came from Captain

Sutton's testimony. Captain Sutton acknowledged that he relied on reports of 28 wake-related incidents in forming this opinion. (Tr. 11/16/21, 1:59:02.) However, in the Court's Order dated October 27, 2021 (Doc. 141), where it ruled on Defendant's 28 motions *in limine*, the Court disallowed formulation of "expert opinion based on reliance on these reports to prove the accident in this case was likely caused by Defendant, and any testimony to that effect from the experts." (Doc. 141 at 5-8.) For this reason, the Court does not consider Captain Sutton's opinion on Rule 7. Because Plaintiffs did not offer any other evidence on the issue, the Court determines that the rule was not violated.

### d.   A.R.S. § 5-343

Plaintiffs also contend that Defendant violated Arizona law. Arizona law prohibits operating a watercraft at speeds above what is "reasonable and prudent" under the conditions and directs watercraft operators to take into account "actual and potential hazards then existing." A.R.S. § 5-343. The statue also specifies that "speed shall be so controlled as may be necessary to avoid . . . swamping other watercraft or otherwise endangering the lives or property of other persons." *Id.*

The Arizona Supreme Court has held that it interprets statutes to "give effect to the legislature's intent." *Parrot v. DaimlerChrysler Corp.*, 130 P.3d 530, 532 (Ariz. 2006) (internal quotation omitted). Because a statute's plain language is the best indicator of legislative intent, Arizona courts do not engage in other means of statutory interpretation unless a statute is ambiguous. *Id.*

Here, the statute is not ambiguous. Unlike Rule 6, the Arizona statute specifically refers to wakes by directing vessels to control their speed in such a way that they do not swamp other watercraft. The legislature's intent was clearly to prevent accidents caused by wakes, not just accidents caused by speeding vessels that happen to generate wakes. The statute does not direct watercraft operators to avoid only excessive speeds but requires speeds that are controlled as necessary to avoid large wakes or other dangers. It also unequivocally tasks watercraft operators with considering the possibility of unseen hazards.

The possibility that another watercraft is on the other side of a blind turn is a potential hazard within the plain meaning of the statute. And, despite the possibility that another vessel was on the other side of the turn, when the Desert Shadow transitioned from plane speed to a slower speed before it had an unobstructed view around the bend, it generated the largest possible wake. Had Defendant followed the Arizona statute and considered potential hazards, it would not have made the transition down from plane at a time when it had reduced visibility and could not know if its wake would endanger another watercraft. Thus, the Court finds Defendant violated A.R.S. § 5-343.

*e.*     *Duty of Ordinary Care*

Even if Defendant had not violated Arizona state law, the weight of the evidence suggests it breached its duty of ordinary care to Plaintiffs.

First, although the Court determined that the narrow channel rule is not applicable here, it was nonetheless a breach of duty for the Desert Shadow to follow a path down the middle of the channel. Where courts have found the narrow channel rule does not apply, the dictates of reasonableness and common sense continue to be pertinent. And "[p]ractical navigation dictates that vessels, when on reciprocal courses, should keep to the starboard in the absence of signals to the contrary." *Tempest v. U.S.*, 277 F. Supp. 59, 62 (E.D. Va. 1967). Here, there were no signals to the contrary. Further, because the Desert Shadow was nearing a blind turn, it was impossible for Captain Anderson to know whether another vessel was on a reciprocal course. Given that Lake Powell is a popular recreational boating area, it was more than a mere possibility that another vessel was around the bend. Thus, it was unreasonable for the Desert Shadow to proceed on a course through the middle of a channel only 600 feet wide under the circumstances present here. This conduct is a breach of duty, regardless of the applicability of Rule 9.

Second, for the same reasons Defendant violated Arizona state law, it also breached its duty of ordinary care to Plaintiffs. In their pre-trial memorandum, Plaintiffs cite to *Moran v. M/V Georgie May*, where the court found a vessel that injured others by her wake responsible under a negligence theory for "failure to appreciate the reasonable effect of her

own speed and motion through the water at the particular place and under the particular circumstances where the injury occurred."164 F. Supp. 881, 884 (S.D. Fla. 1958). (Doc. 132 at 3.) In *Moran* the Georgie May, like the Desert Shadow, was generating its maximum wake at the time it passed the plaintiff's recreational boat. In the present case, the Court found that Defendant violated Arizona state law because as the Desert Shadow rounded the blind turn, it slowed down from plane speed. The change in speed caused the Desert Shadow to produce the largest wake it could create. In doing so, it failed to consider the possibility that watercraft that could be impacted by its wake were present on the other side of the turn, even if they were not immediately visible. In other words, the Desert Shadow's chosen course of action generated the largest possible wake at the riskiest possible time. On these facts a statute is not necessary to find a breach of duty—this action simply defies reasonableness and common sense.

For these reasons, the Court finds Defendant breached its duty of ordinary care under the circumstances.

### f.    Rule 2

Rule 2 provides that "[n]othing in these Rules shall exonerate any vessel, or the owner, master, or crew thereof, from the consequences of any neglect to comply with these rules or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of this case." 33 C.F.R. § 83.02.

To determine whether Rule 2 has been violated, courts consider whether they have found violations of the other Inland Rules or a defendant's failure to exercise its duty of ordinary care. *See, e.g.*, *SCF Waxler Marine LLC v. M/V ARIS T*, 427 F. Supp. 3d 728, 771 (E.D. La. 2019) (finding Rule 2 was violated on the same facts used to find violations of the ordinary practices of good seamanship). Here, for the same reasons that Defendant breached its duty of ordinary care under the circumstances and violated Arizona state law, Defendant also failed to show the appropriate level of precaution "required by the ordinary practice of seamen."

Moreover, Rule 2 states that "due regard shall be had to all dangers of navigation and collision,"[8] but the evidence presented in this case demonstrates that Defendant did not have due regard to the danger that its wake posed to others.

For the reasons above, the Court finds that Defendant violated Inland Rule 2, Arizona state law, and breached its duty of ordinary care to Plaintiffs. Thus, the Court finds that Defendant was negligent.

### 3.    Causation

Next the Court must determine whether Defendant's negligence was the cause of Plaintiffs' injury. Plaintiffs urge the Court to apply the *Pennsylvania* Rule if the Court found statutory rules were breached. The *Pennsylvania* Rule applies when a statutory rule intended to prevent an admiralty accident exists and a party violates that statute, injuring a party whom the statute was created to protect. *Pearce*, 261 F.3d at 648.[9] Under the Rule, the burden shifts to the violating party to show that its violation could not have been the cause of the accident. *Id.* In other words, the rule creates a presumption that a party who violates a statutory rule caused a resulting accident. *SCF Waxler Marine*, 427 F. Supp. 3d at 759. The Ninth Circuit has held that the burden imposed by the *Pennsylvania* Rule is "difficult, if not impossible," to discharge, but "the presumption is rebutted where the defendant shows by clear and convincing evidence that the violation could not reasonably be held to have been a proximate cause of the injury." *MacDonald v. Kahikolu, Ltd.*, 581 F.3d 970, 974 (9th Cir. 2009).

Here, the Court found that Defendant violated both Arizona law and Rule 2 of the Inland Rules of Navigation. The Inland Rules are intended to prevent collisions and other

---

[8] The Sixth Circuit has held that "[t]he term 'collision' is used in a broad sense under the Inland Navigational Rules to include a vessel's wake striking another vessel." *Matheny v. Tenn. Valley Auth.*, 557 F.3d 311, 316 n.3 (6th Cir. 2009). Absent any Ninth Circuit precedent to the contrary, the Court adopts this interpretation.

[9] The Fifth Circuit has held that the *Pennsylvania* Rule is an evidentiary presumption "designed to fill a factual vacuum," and should not be applied where "the parties have introduced evidence to dispel the mysteries that gave rise to the presumption." *In re Mid-S. Towing Co.*, 418 F.3d 526, 531 (5th Cir. 2005) (internal quotations omitted). Regardless, in this case the parties have introduced sufficient evidence for the Court to analyze and determine who is at fault.

navigational accidents, and as the Court noted in footnote 8, *supra*, the Inland Rules interpret the term "collision" broadly to include a vessel's wake striking another vessel. *See* Changes to the Inland Navigation Rules, 79 Fed. Reg. 37,898 (July 2, 2014). Additionally, the Arizona statute Defendant violated was clearly designed to prevent wake-related accidents. Thus, the *Pennsylvania* Rule applies.

Defendant challenges the causation element of Plaintiffs' negligence claim and also rebuts the *Pennsylvania* Rule's presumption by presenting evidence that Mr. Meador's improper handling of the Hallett, as opposed to the Desert Shadow's wake, was the cause of Ms. Meador's injury. Thus, the Court begins this section with its findings of fact as to how the impact with the wake occurred.

At the time of the accident, Mr. Meador, who had been boating for over 40 years, was driving a 29-foot Hallett with a 600 horsepower MerCruiser engine. (Tr. 11/15/21, 9:54:14, 11:03:56.). He first purchased a Hallett boat in 1997, and estimates he spent over 900 hours driving that boat. (Tr. 11/18/21, 10:33:30.) Mr. Meador purchased the particular Hallett boat he was driving at the time of the accident in 2017, which he described as a "high performance" boat that offers both speed and comfort. (Tr. 11/15/21, 9:56:18, 11:04:26, 11:06:09.) Mr. Meador customized the seat height on his new Hallett, citing "more visibility and safety," but the MerCruiser engine was a stock option, and Mr. Meador made no other modifications. (Tr. 11/18/21, 10:34:39, 10:34:57, 10:42:14.) Mr. Meador has never had any formal training in boating but testified that he is aware of the basic rules and regulations of boating from his experience. (Tr. 11/15/21, 9:56:41.)

As the Court found above, the Desert Shadow generated an approximately 3.3-foot wake, with which the Meador boat collided. As Mr. Meador approached the wake, it was moving towards him at a 90-degree angle. (Tr. 11/15/21, 11:27:53.) In other words, it was perpendicular to the Hallett's bow. In the past, Mr. Meador had been successful with the maneuver of throttling back slowly, and then throttling into the wake and turning at a 45-degree angle. (Tr. 11/15/21,11:35:46.) Thus, as the wake neared, Mr. Meador chose to turn his boat to the right, and take the wake at a 45-degree angle:

> At the time I just felt as like it was an emergency situation. I just – I had seconds to make a decision and my decision was to take the wake at a 45-degree angle as you approach a wake, that typically softens the blow.

(Tr. 11/15/21, 11:24:05.) Maeson Lewis described the Hallett's impact with the wake:

> [W]hen we went over the first wave and the boat went down, it was very fast. I didn't have enough time to land before the boat had gone down and had come up again. It was like one of those dreams that you have where you are so far in the air and you don't know how you're going to get down.
>
> …
>
> I had kind of braced my knees a little bit so that it wasn't as hard but it felt like cement still.

(Tr. 11/15/21, 1:56:23, 1:56:45.) As the boat came up a second time, Maeson Lewis described standing over Ms. Meador. (Tr. 11/15/21, 11:55:18.) When the boat came down from the second wave, Ms. Meador was "immediately hysterical." (Tr. 11/15/21, 1:55:47.) Maeson Lewis recalled that Mrs. Meador could not stand up, "cried harder and harder and she was hyperventilating." (Tr. 11/15/21, 1:59:59.)

To advance its argument that Mr. Meador was negligent, Defendant first pointed out that the MerCruiser engine owner's manual, which Mr. Meador received, states that changing the direction during a wake jump can cause occupants to be thrown from their seats, or even from the boat. (Tr. 11/15/21, 11:06:09, 11:09:33; Ex. 103 at 48.) However, the Court notes that there was no testimony to suggest that Mr. Meador was attempting to jump the wake.

Defendant's expert Mr. Curry also stated that Mr. Meador handled the wake improperly. Mr. Curry, whose recreations of the accident were discussed above, opined that the sixth run he filmed was the closest to reality. (Tr. 11/17/21, 2:28:04; Ex. 115.) There, the test boat driver approached the first wake without reducing speed, and then throttled back as the bow lifted off the wake. The resulting impact was violent and threw Mr. Curry and his camera to the deck. (Tr. 11/17/21, 2:28:25; Ex. 115.) However, the Court does not give Mr. Curry's recreations great weight. First, the parameters Mr. Curry used in

his experiments are distinguishable from those the Court has determined most credible. Second, although Mr. Curry opined that the test boats he used would have been more "lively" than the Hallett, this statement on the comparability of the test boats alone is not sufficient evidence for the Court to find the conclusions of the experiments incontrovertible. (*See* Tr. 11/17/21, 2:29:47-29:57.)

Mr. Celano's testimony on the proper way to approach a wake such as the one Mr. Meador encountered was more persuasive. He explained that when approaching a wake on a boat like the Hallett

> [Y]ou actually want to turn to square up on it to get that V [hull] to impact nice and square into it but before that as you slow down you need to be adjusting the trim of both the trim tabs and outdrive to get the boat down into that slower speed regime without having the bow come up on you.

(Tr. 11/17/21, 4:46:21.) He continued, explaining that one should use the trim tabs to drive the bow down. (Tr. 11/17/21, 4:46:21.) But when it comes to the speed of the impact itself, "timing becomes everything." (Tr. 11/17/21, 4:46:21.) He explained:

> If you can slow down to the point where you just sort of slosh through it, then you don't have to do much. If you want to actually keep your speed up and, say, cross it at 30, 35 miles an hour, well, now you have to get fairly active. . . you're going to, first of all, keep the boat from falling off plane and then as the boat dives into the first [] trough, you're going to wait for it and then as it comes up the front side of the wave, you again wait and then you actually wait until just the moment where [the] bow starts to fall and at that point you give it throttle.

(Tr. 11/17/21, 4:46:42-4:47:07.) However, adding throttle too early could be disastrous, because adding throttle lifts the bow of the boat, and in conjunction with other forces, more throttle could exacerbate an upward pitch. (Tr. 11/18/21, 9:13:09.) Mr. Celano also explained the importance of hitting a wake at a perpendicular angle in a boat with a deep-V hull like the Hallett, as opposed to "on the quarter" in a boat with a flat bottom. (Tr. 11/17/21, 4:47:56-4:48:16.)

> [I]f you have a very flat boat then what you are trying to do is to try to present a chine which is the [sharpest] part of the boat to the wave but in the case of

a deep V boat, when do you that, what you are presenting to the wave is now
a flat surface and so that will result in a nasty impact if you do it that way.

(Tr. 11/17/21, 4:48:16.) When the wake is approached in this manner, the "V" presents the least surface area to the impact of the wake, resulting in the lowest levels of acceleration on the boat. (11/18/21, 8:45:52.)

Defendant's third expert, Captain William Dials, opined that a lack of attentiveness on the part of Mr. Meador was the cause of this accident, due to the amount of activity taking place around Mr. Meador, and noted that the most common reason for accidents like the one at issue here is inattentiveness. (Tr. 11/18/21, 9:32:27-32:46, 9:33:54-9:34:15.) Captain Dials opined that Mr. Meador violated Rule 5 of the Inland Rules of Navigation, but for the same reasons the Court found Defendant did not violate Rule 5, it is not persuaded by Captain Dials's opinion on this issue. (Tr. 11/18/21, 9:40:08.)

The Court acknowledges Mr. Meador had mere seconds to figure out how he would respond to the Desert Shadow's wake, as discussed earlier in this Order. In fact, Mr. Celano admitted that even with his experience, he has "misjudged" approaches to wakes. (Tr. 11/18/21, 9:04:31.) During closing arguments, the attorney for Mr. Meador in his capacity as a Counter-Defendant argued that Mr. Meador was *in extremis* as he approached the wake, and with no time to react, his judgment cannot be impugned. (Tr. 11/19/21, 10:33:34.) However, the *in extremis* doctrine "does not excuse a vessel in making a wrong maneuver *in extremis* where the imminence of the peril was occasioned by the fault or negligence of those in charge of the vessel, or might have been avoided by earlier precautions which it was bound to take." *City of Chicago v. M/V Moran*, 375 F.3d 563 (7th Cir. 2004) (quoting 70 Am.Jur.2d Shipping § 619 (2003)). Here the "imminence of the peril" may have been avoidable had Mr. Meador remained perpendicular to the wake. This is a precaution he was bound to take—as the owner of a high-performance boat with a deep-V hull, he should have known the appropriate way to handle a wake in that boat. Thus, Mr. Meador's negligence was a contributing cause of the accident.

Mr. Meador's negligence contributed to Ms. Meador's injury, but the evidence also shows that he was not the sole contributor, and that without the wake Defendant created the accident would not have happened. Defendant has not overcome the *Pennsylvania* Rule's presumption and shown by clear and convincing evidence that its violations of Rule 2 and Arizona law could not reasonably be held to have been a proximate cause of the injury. Even without the *Pennsylvania* Rule's presumption, accounting for all the relevant evidence, the Court determines that Defendant's negligent operation of the Desert Shadow was a substantial cause of Ms. Meador's injury. By maintaining a course down the middle of the channel and slowing its speed to generate the largest wake possible at a time where it could not see around the bend, the Desert Shadow created the situation that gave rise to the accident. That said, Mr. Meador had an obligation to handle the wake properly. Although Mr. Meador is an experienced boater and had approached wakes in this manner before, that does not mean his approach was reasonable. Mr. Meador had an obligation to, at the very least, approach the wake at a perpendicular angle. Accordingly, the Court finds that Defendant is fifty percent liable for the collision and Plaintiff/Counter-Defendant Mr. Meador is fifty percent liable.

### 4.    *Damages*

Because the Court finds that Mr. Meador and Defendant were equally responsible for Ms. Meador's injury, the Court awards damages proportionally. *See, e.g. Phillips Petroleum Co.*, 863 F.2d at 1255. Each aspect of a plaintiff's claim for damages must be supported by concrete evidence and proven with reasonable certainty. *See Walden v. United States*, 31 F. Supp. 2d 1230, 1235 (S.D. Cal. 1998).

### a.    *Medical Expenses*

Ms. Meador's medical bills, which were introduced in the form of an exhibit at trial, amount to $70,746.99. (Ex. 14.) Because the Court found that Mr. Meador was 50% at fault for the accident, Ms. Meador's award must be reduced by half. Accordingly, the Court awards Plaintiffs $35,373.50 for medical expenses.

*b.*     *Pain and Suffering*

The Fifth Circuit has noted that in maritime cases damages for pain and suffering hinge on the particular facts of each case. *Hernandez v. M/V Rajaan*, 841 F.2d 582, 590-91 (5th Cir. 1998).

In this case, there is an additional nuance to the Court's analysis of what damages Ms. Meador should be awarded for her pain and suffering—Ms. Meador was also suffering from terminal cancer at the time of the accident and passed away on November 19, 2021, the last day of trial.

The evidence in this case makes clear that Ms. Meador suffered a great deal of pain from her injury. During her deposition on May 19, 2020, Ms. Meador testified that she knew she was injured "instantly" upon landing after the Hallett encountered the wake. (Annette Meador Dep. 149:13-16.) Maeson Lewis described Ms. Meador as "hysterical" just after the impact, and even mentioned that she had urinated on herself. (Tr. 11/15/21, 1:57:08.) When the paramedics came to Ms. Meador's aid, Mr. Meador said she was "in just a tremendous amount of pain, screaming." (Tr. 11/15/21, 10:29:01.) Ultimately, doctors diagnosed Ms. Meador with compression fractures in her T-11 and T-12 vertebrae. (Ex. 13; *see* Deposition of Jotham Manwaring, M.D. ("Dr. Manwaring Dep.") 10:14-20.)

In the two years that followed, Ms. Meador continued to suffer from consistent pain. When Ms. Meador's oncologist was deposed on September 19, 2020, she testified that despite Ms. Meador's back pain being much improved, she still spoke about how it impacted her day-to-day life, even limiting her time with her grandchildren. (Deposition of Michelle H. Gilbert, M.D. ("Dr. Gilbert Dep.") 13:20-14:3.) During trial, Mr. Meador testified that Ms. Meador was again experiencing severe back pain and had received additional X-rays less than two months prior. (Tr. 11/15/21, 12:01:03.)

Although Ms. Meador suffered from terminal cancer, the evidence in this case makes clear that the pain she suffered due to her back injury was distinguishable from the pain her cancer caused. During her deposition, Ms. Meador explained that both kinds of pain were constant, but "[w]ith the back, its pain level depends on what you do. With the

cancer, it doesn't really depend what you do." (Annette Meador Dep. 105:21-23.) Her back pain was worsened by day-to-day activities, such as "[d]riving in the car, going over any bump, especially a bump that jerks me side to side; any kind of lifting of anything of any kind of weight; bending over; vacuuming; trying to clean floors; any household duties." (Annette Meador Dep. 106:12-16.) As Defendant observes, Ms. Meador was not prescribed pain medication by either Dr. Manwaring or Dr. Gilbert, but given the weight of the evidence illustrating the severity of Ms. Meador's injury, the Court does not find the absence of prescription pain medication indicative of a lack of pain and suffering. (Dr. Gilbert Dep. 9:10-20; Dr. Manwaring Dep. 29:5-12, 29:19.)

Further, there is evidence that Ms. Meador's accident took a psychological toll. Just before the accident, Ms. Meador had reached a point in her cancer treatment where she was feeling well enough that she could resume the activities she enjoyed. (Annette Meador Dep. 106:23-107:4.) She knew that her cancer would return, but she was looking forward to living a full life until it did. (Annette Meador Dep. 107:1-4.)

Most of the time, damages for pain and suffering at admiralty have both a past and future aspect. *See* Thomas S. Schoenbaum, *Admiralty & Maritime* Law § 5-16 (5th ed. 2011). Because Ms. Meador is no longer living, the Court awards pain and suffering damages only for her final two years of life.[10]

Plaintiffs seek a total of $1,500,000 in compensatory damages, one portion of which is damages for pain and suffering. Although the Court could not find precedent from within the District of Arizona discussing awards for pain and suffering at admiralty, courts in other districts have addressed injuries similar to those of Ms. Meador. These awards are highly specific by nature, but these cases nonetheless provide helpful guidance. In *Goodwin v. Cockrell*, a collision between two vessels in North Carolina aggravated the plaintiff's L5-S1 small disc bulge, causing him pain and limiting his daily activities, and causing him to undergo surgery. No. 4:13-cv-199-F, 2015 WL 12851580, at *11 (E.D.N.C. Oct. 14, 2015).

---

[10] If Ms. Meador were still living, the Court would still be obligated to consider her life expectancy in calculating pain and suffering damages, and any award would have been adjusted based on her prognosis.

The *Goodwin* Court awarded the plaintiff approximately $15,000 per year in damages for his past suffering. *Id.* The *Goodwin* plaintiff underwent surgery and Ms. Meador did not, but the plaintiff in *Goodwin* was mobile immediately after the accident, and a doctor directed him to return to work three days later. *Id.* at *3. In *Ledet,* on the other hand, the Fifth Circuit upheld an award of $1,300,000 for the plaintiff's pain and suffering ($300,000 for past pain and suffering and $1,000,000 for future pain and suffering), where the plaintiff suffered compression fractures at his L1 and T12 vertebrae. *Ledet v. Smith Marine Towing Corp.*, No. 10–1713, 2011 WL 1303918, at *14 (E.D. La. Apr. 4, 2011) *aff'd* 415 F. App'x. 417 (5th Cir. 2011). The *Ledet* plaintiff's past damages award amounted to around $150,000 per year, but even after surgery, that plaintiff's compression fractures continued to appear "fresh," while Ms. Meador's showed signs of healing. *Id.* at *8. (*See, e.g.*, Dr. Manwaring Dep. 10:14-16.)

After considering the awards in these cases and the evidence in this case, the Court finds that an award of $160,000 for Ms. Meador's past pain and suffering is appropriate. This award is reduced to $80,000 to reflect Mr. Meador's contributory negligence.

### c.    Loss of Consortium

Mr. Meador seeks to recover damages for loss of consortium. Loss of consortium refers to "loss of the benefits that one spouse is entitled to receive from the other, including companionship, cooperation, aid, affection, and sexual relations." Black's Law Dictionary 1031 (9th ed. 2009). The Ninth Circuit has held that loss of consortium damages are permitted in personal injury negligence actions under general maritime law. *See Chan v. Society Expeditions, Inc.*, 39 F.3d 1398, 1407 (9th Cir. 1994) ("[W]e have also held that the beneficiaries of passengers killed or injured on *state territorial waters* can recover [loss of consortium] damages.") (citing *Sutton v. Earles*, 26 F.3d 903 (9th Cir. 1994)) (emphasis in original). The Court finds that Mr. Meador is entitled to recover for his loss of consortium he suffered as the result of the injuries caused to his wife.

The facts of this case show that Mr. Meador is entitled to recover damages for the loss of society of his wife from the date of the accident, September 27, 2019, to

November 19, 2021, when Ms. Meador died. After Ms. Meador's cancer diagnosis, Mr. Meador took early retirement, and they built a "dream home" in Southern Utah. (Tr. 11/15/21, 12:08:50.) Ms. Meador's injury limited the Meadors' ability to enjoy the recreational activities they had formerly engaged in. However, the Court must observe that the progression of Ms. Meador's cancer would have eventually limited her ability to participate in recreational activities with Mr. Meador as well, even absent her back injury.

Therefore, the Court finds that Mr. Meador should be awarded $40,000 for his loss of consortium. Reduced by half, Mr. Meador is entitled to $20,000.

### d.    Emotional Distress

After trial, Plaintiffs filed a brief asking the Court to consider the impact of Ms. Meador's death with respect to Mr. Meador's "emotional/consortium" damages. (Doc. 177 at 1.) Plaintiffs argue that because Mr. Meador was in the "zone of danger" at the time of the accident, his emotional distress damages may be presumed.[11] (Doc. 177 at 1.)

Defendant responded to Plaintiffs' brief, arguing that it is not only untimely, but also must fail because Mr. Meador did not present evidence to show that his "emotional distress manifested as a physical injury that occurred at the time of the accident." (Doc. 180 at 2.) Plaintiffs replied, counterarguing that paragraphs 15 and 16 of their Complaint address Mr. Meador's emotional distress claim:

> 15.    Larry Meador has suffered an equally devastating emotional trauma caused by Aramark with his already gravely ill wife being needlessly incapacitated by the gross negligence exhibited by Aramark's crew as outlined herein.

> 16.    The Meador's injuries and related damages exceed the jurisdictional limitations of this court.

(Doc. 1 ¶¶ 15-16.)

---

[11] Although Plaintiffs do not refer to this claim as one for "negligent infliction of emotional distress," the Court notes that Plaintiffs rely on the "zone of danger" doctrine, which is integral to such a claim in Arizona, and analyzes Plaintiffs' claim accordingly.

While Plaintiffs' claim for damages arising from loss of consortium was clear at trial, no emotional distress damages on Mr. Meador's part were discussed, nor were emotional distress damages mentioned in Plaintiffs' pretrial briefing. (*See* Doc. 132.) Further, the Court is not convinced that a passing mention of "emotional trauma" in Plaintiffs' Complaint suffices to put Defendant on notice that Mr. Meador was seeking damages for negligent infliction emotional distress. Nevertheless, due to the atypical briefing of this matter, the Court will explain why Plaintiffs' claim for emotional distress damages fails on the merits as well.

Parties are correct to begin their analysis with *Chan v. Society Expeditions*, and the Court begins with that case as well. *See* 39 F.3d 1398 (9th Cir. 1994). In *Chan*, the Ninth Circuit determined that while claims for emotional distress are cognizable under admiralty law, courts should consult state common law for guidance in determining recovery. *Id.* at 1408-1409.

Arizona applies the "zone of danger" test to determine whether damages for negligent infliction of emotional distress are proper. *See, e.g.*, *Harding v. Sternsher*, No. 1 CA–CV 16–0127, 2017 WL 3138184 (Ariz. Ct. App. July 25, 2017). Such a claim requires the plaintiff to prove that he or she "witnessed an injury to a closely related person, suffered mental anguish manifested as physical injury, and was within the zone of danger so as to be subjected to an unreasonable risk of bodily harm created by the defendant." *Id.* at *4 (quoting *Rodriguez v. Fox News Network, L.L.C.*, 356 P.2d 322, 325 (Ariz. Ct. App. 2015)); *see also Pierce v. Casas Adobes Baptist Church*, 782 P.2d 1162, 1165 (Ariz. 1989).

This standard clearly requires evidence of mental anguish that manifests as a physical injury. Whether the other elements of the claim are satisfied is irrelevant without such evidence. Although Mr. Meador clearly has been impacted severely by the accident at issue, Plaintiffs' naked allegation of Mr. Meador's "equally devastating emotional trauma" does not suffice to show that his mental anguish manifested as a physical injury. Thus, the claim must fail. On these facts, an award of damages for negligent infliction of emotional distress is improper.

### C.    Punitive Damages

Under general maritime law, a plaintiff may recover punitive damages where the plaintiff's injury was due to the defendant's wanton, willful, or outrageous conduct. *Atlantic Sounding Co., Inc. v. Townsend*, 577 U.S. 404, 408-409 (2009). The upper limit of an award of punitive damages in maritime tort cases is a 1:1 ratio of compensatory-to-punitive damages. *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 475 (2008).

Several cases offer guidance on when a finding of punitive damages is proper under general maritime law. In *Bergen v. F/V St. Patrick*, the Ninth Circuit overturned a trial court's punitive damages award, holding that the violation of the statutory requirement that officers of the ship must be licensed for operations on the high seas, though sufficient for a finding of negligence *per se*, was not enough to prove "willful" conduct. 816 F.2d 1345, 1349 (9th Cir. 1987). In fact, the Ninth Circuit has consistently held that "mere statutory violations" do not demonstrate the requisite level of "reckless indifference for the rights of others" necessary for a punitive damages award. *Dunn v. Hatch*, 792 F. App'x. 449, 452 (9th Cir. 2019) (where a contract was oral, rather than written as required by statute) (citing *Exxon Shipping Co. v. Baker*, 544 U.S. 471, 493 (2008)). Additionally, the First Circuit has determined punitive damages were improper where a manager had "no reason to suspect" misconduct and remained unaware of it until after the fact. *Muratore v. M/S Scotia Prince*, 845 F.2d 347, 356 (1st Cir. 1988).

Unlike the cases cited above, however, there is ample evidence in this case that Defendant's conduct was willful. The Court has found that more than "mere statutory violations" gave rise to Ms. Meador's injury, and as discussed below, Plaintiffs have introduced facts to show that Defendant was aware of its issues with wakes long before Ms. Meador was injured.

At trial, Plaintiffs advanced their argument in favor of punitive damages by presenting evidence that Defendant was on notice that its tour boats generated large, potentially dangerous wakes. As a preliminary matter, the Court notes that some of the materials referenced during trial were discussed in the Court's October 27, 2021 Order

addressing Defendants' Motions *in limine*. (Doc. 141.) In that Order, the Court held that certain materials were admissible for the limited purpose of demonstrating that Defendant was aware of their contents at the time of Plaintiffs' accident. (*See generally* Doc. 141.) Here, these materials are analyzed only for that limited purpose.

The Court admitted a November 26, 2016 email from Aramark employee Raynae Dodson to Ryan Zimmer, describing an incident where a tour boat wake reached a woman resting on a beach, and carried her, her kayak, and her supplies out into the water. (Ex. 41.) Kay Alvis, who reported the incident described in the email, testified at trial and confirmed that the email comported with the events as she remembered them. (Tr. 11/15/21, 3:41:48.) The Court also admitted a September 1, 2018 email from Aramark employee Jeremy Peterson to Connor Hansen, who forwarded the email to Robert Knowlton. (Ex. 51.) It detailed an accident that had taken place that day:

> An older woman on the boat was placed into a stretcher and loaded into an ambulance. I spoke with one member of the party who said that they went over a tour boat wake and the impact injured the older woman's back.

(Ex. 51.) The above describes Christine Gilmour's ("Ms. Gilmour") back injury, which she sustained when the boat her family had rented collided with a wake generated by an Aramark tour boat. (Tr. 11/16/21, 8:57:37.) Ms. Gilmour described the sensation of hitting the wake, explaining how the boat lifted and she rose into the air, and then slammed against her seat as it dropped back down. (Tr. 11/16/21, 9:31:27.) Her husband, Gregory Gilmour ("Mr. Gilmour") is a retired Chilean naval officer and was driving the boat at the time of the accident. (Tr. 11/16/21, 8:40:14, 8:42:53.) He testified that the tour boat was "in that transitional mode" where it "creates large wakes" as it passed him on his port side. (Tr. 11/16/21, 8:43:22-8:43:44.) A subsequent email from Ryan Zimmer to Robert Knowlton and Aric Ferrell noted that "the timing of the incident does place the Desert Shadow in the area." (Ex. 53.) Both incidents demonstrate that Aramark was aware that its tour boats had the potential to generate dangerous wakes.

Bolstering their argument that Defendant was on notice, Plaintiffs' counsel asked Aramark employee Robert Knowlton about an email Joe Ligon, who Mr. Knowlton explained manages hardware engineering at Aramark, sent to a commercial boat company. (Tr. 11/17/21, 9:27:58.) In the email, Mr. Ligon wrote "We have been operating these large tour boats with very big wakes for 40 years and would like to change the way we do boat tours. Faster with less wake." (Tr. 11/17/21, 9:28:18.) Additionally, Plaintiffs' counsel asked Mr. Knowlton about an email he sent to Kelly Zwierzchowski ("Ms. Zwierzchowski") that referenced complaints about wake and noise. (Tr. 11/17/21, 9:38:34.) Mr. Knowlton explained:

> "I'm sure I was referencing to the wake claims that we have, you know, current litigation on and then noise, newer technology in boats as far as engineering has sound deadening technology to where they are a lot quieter, the generators and the engines, happens are – there's a specific material used for that."

(Tr. 11/17/21, 9:39:10.) Even if Mr. Knowlton's primary concern was not wakes, his email nonetheless indicates that Defendant was on notice of wake-related problems.

At trial, the Court also heard from several of Defendant's current and former employees regarding Aramark's wake-related policies and practices. During his September 1, 2016 deposition for a different case involving Aramark, Bridger Christensen ("Mr. Christensen"), who was at the time involved in risk management at Aramark, was not aware of any wake-issue-related training programs being conducted with boat operators. (Deposition of Bridger Christensen ("Christensen Dep.") 10:10-14, 22:21-24, 24:24-25:5.) During his July 26, 2019 deposition, Tony Anderson mentioned that Aramark has bi-weekly "safety calls." Mr. Anderson was unaware of any safety calls that discussed the issues presented by tour boat wakes, but noted that they're "overall occupationally safety related and focused." (Tony Anderson Dep. 23:2-16.) At the time of trial, Robert Knowlton, Aramark's General Manager of Boat Rentals, Tours, and River Operations in Arizona State Parks could not recall any wake-related safety meetings. (Tr. 11/17/21, 8:35:05, 9:33:59.) Here, a reasonable inference is that despite being aware of wake-related

1    injuries, Defendant made a conscious decision against discussing these risks with its tour
2    boat captains, even though they may have been the employees best positioned to prevent
3    future accidents.

4           In the same vein, Plaintiffs also introduced evidence of Aramark's wake-related
5    record-keeping practices. During her August 10, 2020 deposition, Ms. Zwierzchowski,
6    Aramark's Vice President of Operations, testified that while accidents involving tour boats
7    are logged in a Coast Guard form, records of wake claims are maintained only in internal
8    emails. (Deposition of Kelly Zwierzchowski ("Zwierzchowski Dep.") 15:4-24.)
9    Furthermore, Ms. Zwierzchowski could not recall any internal investigation of a wake-
10   related allegation during her time at Aramark. (Zwierzchowski Dep. 23:10-21.) This
11   practice suggests that Defendant did not take reports of wake claims seriously.

12          For its part, Defendant introduced evidence that the National Park Service evaluates
13   Aramark twice each year, and for the last two years, Aramark has been awarded "Superior"
14   scores on the evaluations. (Tr. 11/17/21, 8:38:48.) Tour boats are one of the "facets" of
15   Aramark's operations that the National Park Service considers. (Tr. 11/17/21, 8:39:07.)
16   However, the details about the Park Service's grading system were unclear, and the fact
17   that Aramark received favorable ratings from the Park Service does not detract from the
18   fact that it was clearly on notice that its tour boats were generating potentially unsafe
19   wakes.

20          Defendant also made the point that in the grand scheme of things, the accidents the
21   Court learned about are anomalies, and overall, Aramark is running a safe operation. Here,
22   the Court focuses on two points: (1) for anomalies, it strikes the Court that the incidents
23   discussed at trial were remarkably similar; and (2) absent any semblance of an
24   investigation, it seems not only incongruous, but also conclusory to find that the operation
25   at issue is safe.

26          The evidence outlined above shows that Defendant was not only on notice that its
27   boats were generating potentially dangerous wakes as they navigated Lake Powell, but also
28   that it was unconcerned with this fact. This indicates Defendant's conduct was willful. The

1   fact that there were not more wake-related incidents is fortunate, but it does not excuse or

2   justify Aramark's conduct. The Court finds that Defendant showed a "reckless indifference

3   for the rights of others" and punitive damages are warranted.

4        Considering the 1:1 limit of compensatory to punitive damages in maritime tort

5   cases and the evidence in this case, the Court finds that an award of $100,000 in punitive

6   damages is proper.

7        **IT IS THEREFORE ORDERED** finding Plaintiffs are entitled to judgment on

8   their negligence claim and awarding Plaintiffs $135,373.50 in compensatory damages.

9        **IT IS FURTHER ORDERED** finding Plaintiffs are entitled to judgment on their

10   punitive damages claim and awarding Plaintiffs $100,000 in punitive damages.

11        **IT IS FURTHER ORDERED** finding Mr. Meador is not entitled to judgment on

12   his negligent infliction of emotional distress claim.

13        **IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment, as

14   follows, and close this case: Judgment is granted in favor of Plaintiffs and against

15   Defendant on Plaintiffs' negligence claim, and Defendant is ordered to pay $135,373.50 in

16   compensatory damages to Plaintiffs. Judgment is also granted in favor of Plaintiffs and

17   against Defendant on Plaintiffs' punitive damages claim, and Defendant is ordered to pay

18   $100,000 in punitive damages to Plaintiff. Judgment is also granted in favor of Defendant

19   and against Plaintiffs on Plaintiffs' negligent infliction of emotional distress claim.

20        Dated this 14th day of February, 2022.

21

22        Honorable John J. Tuchi

23        United States District Judge

24

25

26

27

28